KIMBERLY DAHMS *vs.* COGNEX CORPORATION & others.[1]

Middlesex. May 5, 2009. - October 15, 2009.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, & GANTS, JJ.

*Employment,* Sexual harassment. *Evidence,* Settlement offer, Judicial discretion, Relevancy and materiality, Hearsay, State of mind. *Practice, Civil,* Instructions to jury.

At the trial of a civil complaint alleging, inter alia, sexual harassment in employment and retaliation, the judge did not err in allowing the defendants (the corporate employer and one of its officers) to introduce in evidence statements made during settlement negotiations on a claim that the plaintiff filed with the Massachusetts Commission Against Discrimination, where the statements were probative of whether the work restrictions imposed on the plaintiff subsequent to the filing of that claim were imposed for a nonretaliatory purpose. [198-199]

At the trial of a civil complaint alleging, inter alia, sexual harassment in employment and retaliation, the judge did not abuse his discretion in allowing the introduction of evidence regarding the plaintiff's clothing, speech, and conduct, where the plaintiff's counsel was the first to mention evidence of this type and introduced photographs of the plaintiff and other employees of the corporate defendant in various party costumes; where such evidence was probative of whether the plaintiff was subjectively offended by her work environment or by the conduct of one of the individual defendants, and was not admitted as character evidence; and where some of that evidence was also relevant to show another individual defendant's state of mind. [199-202]

At the trial of a civil complaint alleging, inter alia, sexual harassment in employment and retaliation, the judge's exclusion of a certain witness's testimony about the substance of a telephone conversation did not rise to the level of an abuse of discretion, where the judge permitted the witness to testify that the plaintiff contacted her and was upset on the telephone. [202-204]

The judge at a civil trial did not abuse his discretion in declining to take judicial notice of the release date of a movie, or in denying a request for rebuttal testimony regarding the date of the movie's release, where the party seeking to introduce such testimony had not proposed a proper method for introducing such evidence before resting its case-in-chief. [204]

At the trial of a civil complaint alleging, inter alia, sexual harassment in employment and retaliation, although the judge's instruction on the claim that two of the individual defendants created a hostile work environment contained error, the verdict would not have differed absent the error. [204-208]

CIVIL ACTION commenced in the Superior Court Department on June 24, 1999.

---

[1]Robert J. Shillman and John J. Rogers, Jr.

The case was tried before *Stephen E. Neel*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Wendy H. Sibbison* for the plaintiff.

*Joan A. Lukey* (*Elizabeth E. Feeherry* with her) for Cognex Corporation & another.

*Justine H. Brousseau* for John J. Rogers, Jr.

*Rebecca G. Pontikes, Tara M. Swartz,* & *Jonathan J. Margolis,* for Massachusetts Chapter of the National Employment Lawyers Association, amicus curiae, submitted a brief.

*Catherine C. Ziehl* & *Beverly I. Ward,* for Massachusetts Commission Against Discrimination, amicus curiae, submitted a brief.

CORDY, J. Kimberly Dahms, an employee of Cognex Corporation (Cognex), filed a civil complaint alleging that John J. Rogers, an officer of Cognex, subjected her to "quid pro quo" sexual harassment over the course of several years in violation of G. L. c. 151B, § 4 (16A)[2]; Cognex and Robert J. Shillman, the chief executive officer of Cognex, aided and abetted Rogers's harassment by failing promptly to investigate his conduct and take corrective measures to stop it; Rogers and Shillman created a hostile work environment in violation of G. L. c. 151B, § 4 (16A); and all three defendants wrongfully retaliated against her in violation of G. L. c. 151B, § 4 (4), because she reported being sexually harassed and filed a charge with the Massachusetts Commission Against Discrimination (MCAD). She also claimed that Rogers was liable for assault, battery, and intentional infliction of emotional distress. The trial commenced on October 1, 2003, and on November 10, the jury returned a verdict for the defendants on all counts. Dahms appealed, arguing that the judge erred in allowing certain evidence to be introduced, in excluding certain other evidence, and in instructing the jury on hostile work environment sexual harassment. We transferred the case from the Appeals Court on our own motion.[3] We affirm.

1. *The trial.* The following evidence was introduced at trial. In

---

[2]Dahms initially made a similar claim against Shillman. At trial, she abandoned the claim. See note 12, *infra.*

[3]We acknowledge amicus briefs submitted by the Massachusetts Chapter of the National Employment Lawyers Association and the Massachusetts Commission Against Discrimination (MCAD).

1981, Shillman cofounded Cognex, a company that designs and manufactures computer systems that can "see" their surroundings. Dahms, who held a bachelor of science degree in computer engineering, was hired by Cognex in 1990 and by 1996 had become its director of customer satisfaction. In her position at Cognex, Dahms was subject to a noncompete agreement. Dahms reported to Patrick Alias, the executive vice-president of sales and marketing at Cognex, who reported to Shillman. Rogers, a certified public accountant, joined Cognex in 1991 and, at different times, held the titles of vice-president of finance and administration, chief financial officer, and treasurer.

In 1996, Rogers moved to the town where Dahms lived, and the two sometimes traveled to work together. Dahms testified that she and Rogers began discussing the failure of one of his recent romantic relationships, and that Rogers was "heart-broken." Rogers testified that they also discussed Dahms's boy friend at that time, a Cognex engineer named Michael Cook, and that from the summer of 1996 until the summer of 1997 they frequently discussed their personal lives and relationships.

Much of the trial focused on the broadening of the relationship between Rogers and Dahms in 1996 and 1997. Dahms testified that she and Rogers "became friendly" and sometimes saw each other outside of work. Marilyn Matz, who at the time of trial was a senior vice-president in charge of engineering at Cognex, testified that Dahms and Rogers appeared to be friends, and that they "chatted" and "danced at parties." Jo Ann Woodyard, vice-president of corporate employee services at Cognex (including human resources and corporate communications), testified that Dahms "obviously had a friendship with [Rogers]," and that during the first half of 1997, she increasingly saw Dahms socialize with Rogers at company events, at times placing a "hand on the [other's] arm" and frequently socializing in hallways and in meetings. She said Dahms appeared "happy" and "friendly." She also reported often seeing Dahms in Rogers's office with the door closed.

Dahms testified that Rogers asked her to accompany him to his high school reunion and that this made her uncomfortable. She also testified that he asked to spend a weekend with her in her rented ski house; Rogers denied this. Dahms further testified

that she never had any romantic interest in Rogers; Rogers testified that she initiated a first kiss, and that she "had very strong feelings" for him.

As of January, 1997, Rogers was dating a woman whom he later married. By the spring, 1997, Dahms was living with Cook, whom she later married. Around that time, Dahms began receiving voicemails from Rogers, which she recorded and kept; he described her as beautiful, said that he dreamed of her, and said that he wanted to kiss her. Rogers testified that Dahms left him voicemails with a similar tone, but that he did not have any reason to record them. Dahms denied that she had left such voicemails for Rogers.

In March, 1997, Dahms and Rogers took a business trip to Japan. She testified that at dinner one night, he told her that he would have a role in her next promotion. He had a lot to drink that night, she said, and he later tried to push open the door to her hotel room; she shut the door and locked it, and thirty minutes later he returned and pounded on the door. Dahms was upset by this and telephoned a friend, Denise Donovan, in the United States, to talk about it. Rogers denied Dahms's version of events, testifying that she invited him to her room that night, and that he left the room without incident.

Finally, Dahms and Rogers testified that they went on a rafting trip in June, 1997, together with their future spouses. Dahms said that the trip was uneventful, except that Rogers once stated that he was "the guy who decided how much money [Cook] and [Dahms] made." Rogers said that Dahms was excited about the trip, and that he and Dahms talked about how they might be better suited for each other than the people they were dating at the time because they both enjoyed outdoor activities.

After the rafting trip, Dahms testified, she ended all nonwork contact with Rogers. Soon thereafter, Rogers registered complaints about Dahms to her direct supervisor, Alias, on her use of a company credit card, her travel expenses, and her criticism concerning an unsuccessful Cognex project. Dahms told Alias in August, 1997, that such criticism might not be objective because she had told Rogers that she "didn't want to date him."[4]

---

[4]Dahms testified that she subsequently played for Patrick Alias the voice mail messages that Rogers had left for her, and that Alias told her that she might want to "follow-up with [a] lawyer."

In September, 1997, Dahms approached Shillman to discuss Rogers's conduct, and played the voicemails for him.[5] Shillman was "outraged" and "distraught" that "Rogers had gotten involved with a female at Cognex against [his] specific orders."[6] He began pacing around his office, and told Dahms that "this would be the last time that Mr. Rogers would do that." He told Dahms that he would fire Rogers if she wished; she initially did not respond, but later told Shillman that she did not want him to fire Rogers.[7] He asked Dahms to write a summary of Rogers's actions, and to deliver to him copies of the tape recordings of the voicemails. Approximately one month later, Dahms sent Shillman the tapes and a two-page memorandum highlighting Rogers's conduct.

After the meeting with Dahms, Shillman began an investigation into Rogers's conduct, and reminded Rogers that he was prohibited from engaging in any type of romantic relationship with a Cognex employee. He did not inform Rogers of Dahms's complaint because she had asked him to keep the report confidential. Rogers lied to Shillman, saying that he had not "asked anybody out at Cognex." Shillman testified that he believed Rogers had "misbehaved," but struggled over the proper response in light of Dahms's request that Rogers not be fired.

Shillman then approached Woodyard for advice; she surprised him by saying he should "take a step back" before acting. She told him that Dahms and Rogers "had a very close relationship," and had had dinners and dates together. He testified that in light of this information (which he was told was "company knowl-

---

[5]Prior to this meeting, Alias had informed Shillman that Dahms had complained to him about Rogers, and that he (Alias) had told Dahms to consult with a lawyer about her complaint. Shillman later disciplined Alias for violating a company policy that provided that someone in Dahms's position be referred first to the human resources department, and then to see Shillman if she remained "uncomfortable."

[6]Earlier in his employment at Cognex, Rogers had romantic relationships with two female employees who reported to him. There were no allegations of sexual harassment; however, Shillman determined that it was inappropriate for Rogers to be romantically involved with Cognex employees who reported to him and had fined him $10,000 for the first relationship and $100,000 for the second. Shillman also delayed the vesting of some stock options that Rogers was due to receive.

[7]Shillman testified that Dahms told him that she did not want Rogers to be fired, but just wanted "to make sure my job here is secure," and that he gave her "that sense of security."

edge"), he was "confused why [Dahms] would make these claims." He began asking Cognex employees about their relationship, and learned that Dahms had cooked food for Rogers; that they went on skiing, rafting, and other trips together; that they had gone on double-dates together; and that they visited each others' homes. He testified that at this point, although he was still inclined to fire Rogers for becoming involved with a Cognex employee, he had concluded that Rogers's "voice-mails were wanted, not unwanted," and that Dahms was "making a false claim" about the harassment. He continued to weigh his response to Rogers's behavior, and checked in with Dahms approximately five times in the months following the receipt of her memorandum to see if Rogers was bothering her in any way; she said he was not. There were no new developments regarding Dahms's harassment claims, and Shillman testified that by 1998 he "was comfortable that the matter of John Rogers and [Dahms] was over."[8]

On May 13, 1998, Cognex held a meeting with an important customer. The customer had reported serious problems with some Cognex products, and requested the meeting to discuss how Cognex would solve them. During the meeting, several Cognex employees gave presentations outlining and discussing the project from various points of view. Shillman testified that when Dahms stood to give her own presentation, she stated that the problems were caused by Matz, who was in the room. This, Shillman testified, angered him, and that it was "frankly the worst thing that can happen in front of a customer."[9] He pulled Dahms aside in the parking lot as they were leaving the meeting, and told her that he was disappointed that she would "blame other people in the company in front of a customer." In response, she said, "Bob, I want you to pay my legal fees," referring to her having consulted with a lawyer in the summer of 1997 about a possible harassment claim arising from Rogers's conduct. He said that he would consider paying them if she submitted receipts, but that her legal claim was not connected to her behavior in the meeting with the

---

[8]In December, 1997, Shillman became further convinced that the matter had ended when Rogers announced that he had become engaged to marry.

[9]Dahms testified that she never mentioned Matz's name during the meeting, nor did she know that Matz's department was involved in the project. Matz testified that Dahms told the client that it was the engineering department's fault. Matz was in charge of that department.

customer.[10] One month later, she submitted legal bills totaling $4,500. Shillman then called Dahms to a meeting, and offered her $5,000 and 10,000 shares of Cognex stock if she would agree to release the company and its officers and employees from any claims of harassment she might have arising out of Rogers's conduct. She rejected the offer.

Dahms filed a complaint with the MCAD on August 7, 1998. In addition to sexual harassment claims against Rogers, the complaint alleged that Cognex had created a sexually hostile work environment, and that Shillman (personally) had both sexually harassed Dahms and had created a hostile work environment.[11] Shillman testified that he was shocked to be named personally in the MCAD complaint, that he had never sexually harassed anyone, and that he knew the claims against him were false.[12] At that point, he said, he began gathering evidence to defend himself. He sent an electronic mail message (e-mail) to Woodyard asking her for copies of photographs and videotapes of Dahms, descriptions of any complaints employees had made about Dahms, and a "list of rumors/things that you've heard about [Dahms] . . . with some information about how we can track these rumors down." He testified that he sought to demonstrate that "she enjoyed being at the company," and that "she was an active participant and enjoyed the culture of the company," which, as others described it, was based on a "work hard, play hard" team building philosophy.

Over the next few months, Dahms's attorney and the defendants sent several letters to each other in an attempt to negotiate a settlement of the MCAD claim.[13] On August 21, 1998, Dahms's

[10]Dahms testified that Shillman had earlier promised to pay her legal bills, and that she was merely asking how she should submit her receipts for reimbursement.

[11]After the MCAD complaint was filed, the Cognex board of directors appointed three outside directors to a special committee to investigate the charges against the company and its officers. The board concluded that there was no sexual harassment, but that Rogers should be fired for unprofessional conduct. Rogers was fired on November 17, 1998.

[12]Dahms initially included a claim of "quid pro quo" sexual harassment against Shillman in her complaint filed in the Superior Court, but later abandoned it. At trial, Dahms testified only that Shillman "created" a hostile work environment.

[13]As discussed later, the jury did not learn that these letters were part of an ongoing settlement negotiation.

attorney outlined the terms that Dahms would accept in settlement, and also wrote that "it is our position that a court would not be likely to enforce a non-compete agreement given the egregious behavior of the company." On September 15, Dahms's attorney wrote that "Ms. Dahms will not agree to abide by the non-compete agreement, which would preclude her from finding any meaningful employment for the next two years. As previously stated to you, we believe Cognex has very little likelihood of enforcing the agreement . . . ." On October 14, Dahms's attorney sent a new settlement offer to counsel for Cognex, writing that, "[w]ith regard to the suggestion of Ms. Dahms remaining with Cognex, that is not an option." None of these letters was introduced in evidence.[14]

Shillman then wrote a letter to Dahms on October 27, 1998, stating that in an October 7 meeting and in the previous letters from "your attorney," Dahms had made "unequivocal statements that [she] would not remain at Cognex under any circumstances and that it simply was not open for discussion," and had "expressed insistence that [she] intend[ed] not to be bound by the non-compete provisions" that she signed when joining the company. As a consequence, he wrote, while Dahms remained an employee of Cognex, her access would be restricted, including access to the physical facility, proprietary information, and strategic planning. She would be required to leave Cognex by 6:30 P.M. each day and to leave meetings when strategic discussions began, and her access to computer files would be limited to those deemed necessary for her work.[15] Shillman testified that the restrictions were necessary only because Dahms had stated an intention to leave the company and compete with it, and that he personally informed Dahms that the restrictions would be lifted "if she would reaffirm her non-compete commitment."[16]

On June 24, 1999, Dahms filed the present civil complaint, and alleged that these restrictions (among other things) constituted retaliation for the filing of her MCAD complaint in August,

---

[14]The September 15 letter was briefly entered in evidence, but quickly withdrawn.

[15]The October 27 letter was admitted in evidence.

[16]On November 9, 1998, Dahms told Woodyard that she would abide by the noncompete agreement, and referred Woodyard to a letter written by Dahms's attorneys stating the same.

1998. Over the ensuing months, Shillman testified that Dahms spent a large portion of each day at Cognex working on her legal case, and that she was "inundat[ing]" coworkers with e-mails and voicemails about her claims.[17] Alias testified that Dahms came to work less frequently, and was not working well with her Cognex peers. She was terminated on June 6, 2000; Alias testified that he made the decision to terminate her because he "wasn't able to make her work."

2. *Discussion.* On appeal, Dahms argues that the judge committed five errors that alone or in combination require a new trial: (1) allowing the defendants to introduce in evidence references to settlement negotiations; (2) admitting evidence of Dahms's dress, speech, and conduct, which she contends was inadmissible "character and propensity evidence"; (3) excluding Denise Donovan's testimony about the substance of Dahms's telephone call to her from Japan; (4) excluding evidence of the general release date of a movie, a matter, Dahms contends, that was relevant to Rogers's credibility; and (5) instructing the jury to enter a judgment for the defendants on the hostile work environment claim if Dahms was "a willing participant in sexual behavior in her workplace."

a. *Evidence referring to settlement negotiations.* Dahms argues that the judge improperly allowed in evidence Shillman's October 27, 1998, letter and his related testimony on Dahms's intention to leave and compete with the company, thereby improperly presenting the contents of a settlement negotiation to the jury. "We do not disturb a judge's decision to admit evidence absent an abuse of discretion or other legal error." *Zucco* v. *Kane*, 439 Mass. 503, 507 (2003).

Typically, offers of settlement are inadmissible to prove or

---

[17]Electronic mail messages (e-mail) from other employees supported this testimony. Glenn Wienkoop, an executive vice-president of engineering, sent an e-mail on November 2, 1998, stating that he hoped to "end the wasted e-mail efforts by [Dahms]," and that she was "totally disconnected as she has been while this legal issue has been in progress." Peter Herman, who was hired to replace Dahms as the head of customer service for one Cognex project, wrote an e-mail on January 25, 1999: "I would appreciate it if you would not send to me any more voice-mails from Kim Dahms unless they begin adding more value . . . . My time is far too precious to listen to what appear to be someone who spend[s] their days focused on political BS versus solving customer problems and satisfying their needs."

disprove a defendant's liability. *Id.* at 509. This rule attempts "to encourage settlements by limiting the collateral consequences of a decision to compromise." *Id.* There are, however, exceptions to that rule. First, factual statements made during the course of settlement negotiations are admissible. See M.S. Brodin & M. Avery, Massachusetts Evidence § 4.6, at 183 (8th ed. 2007), and cases cited. Second, evidence regarding the settlement may be admissible if it "is relevant for some other purpose . . . . There may be situations . . . in which evidence of a settlement, or the amount of a settlement, will bear on some issue in the case other than damages, and an automatic rule of exclusion should not be applied." *Morea* v. *Cosco, Inc.,* 422 Mass. 601, 603 (1996).

The evidence admitted in this case was relevant for a purpose other than liability or damages on the MCAD claim about which the negotiations related. The evidence was probative of whether the work restrictions imposed by Shillman subsequent to the filing of that claim were imposed for a nonretaliatory purpose. Specifically, the statements made in settlement negotiation correspondence were properly admitted for the purpose of demonstrating Shillman's state of mind at the time he imposed the work restrictions on Dahms.

The judge carefully weighed the benefits and potential prejudice of this evidence. In discussions with Dahms's counsel, the judge agreed that the evidence (devoid of the settlement context) might appear to show an unequivocal threat by Dahms to leave and compete with the company. He attempted to lessen any prejudicial impact of that evidence, without revealing the settlement negotiations themselves, by instructing the jury (during Shillman's testimony) "as a matter of law that those statements are not unconditional statements that [Dahms] intended, absolutely intended not to . . . comply with the noncompete provision. So, to the extent that a layperson reading the letters might conclude otherwise . . . that conclusion would be mistaken." Dahms accepted this formulation by the judge and made no objection to it.

In context, neither the judge's rulings admitting the evidence nor his subsequent instruction was erroneous.

b. *Evidence of Dahms's clothing, speech, and conduct.* Before trial, Dahms filed a motion "to exclude alleged character

evidence of plaintiff's sexual behavior, general sexual predisposition, and 'wild' nature." The defendants opposed that motion, arguing that evidence "regarding Ms. Dahms's dress, speech, conduct and behavior is probative of her claim that the 'work hard, play hard' culture subjected her to an unwelcome (i.e., hostile) work environment by all of the defendants." The judge's failure to rule on the motion was effectively a denial.

Dahms argues on appeal that her motion should have been allowed, and that the judge improperly allowed the introduction of evidence regarding her clothing, speech, and conduct which, she contends, was irrelevant "character and propensity evidence" and unfairly prejudiced the jury against her.

At trial, Dahms's counsel was the first to mention evidence of this type. In his opening statement, her attorney said that Shillman once told Dahms, "You're partially at fault for this. You dress provocatively. You turn men on. You're responsible for Mr. Rogers' behavior."[18] Counsel then called Shillman as the first witness, and specifically raised the issue of Dahms's clothing in questions to him, asking him several times whether he had told Dahms "that her appearance and work attire were provocative and seductive."[19] Her attorney also introduced five photographs of Dahms at Halloween parties, stating, "These are the costumes you complained were too provocative or seductive, right?"[20] Finally, Dahms's attorney introduced photographs of Dahms at other Cognex functions; several photographs of other Cognex employees wearing Halloween costumes; and a photograph of Shillman wearing a dress at a Cognex event.

On cross-examination, Shillman explained that in his view Dahms had worn inappropriately revealing clothing in a large meeting with Cognex employees. He also testified that she made a crude joke at a Cognex party, which was recorded on videotape and introduced in evidence; and told a sexual story to

---

[18]Defense counsel made no mention of evidence of this kind in their opening statements.

[19]Shillman answered, "I did tell her on at least one occasion that I felt that she dressed inappropriately for a business setting."

[20]Counsel asked whether Shillman "told [Dahms] that her Halloween costumes were too provocative and seductive." Shillman answered, "I probably said they were 'hot,' . . . [or] see-through." Finally, counsel asked Shillman to describe one of her Halloween costumes, which he described as a see-through Empire State Building.

coworkers, who Shillman later tried to interview in preparing to defend against the hostile work environment claim. Rogers subsequently testified about several statements Dahms made to him, including statements about her sexual preferences; a story she told him about why she was late for skiing; and a story relating to the movie, "There's Something About Mary." He testified that the bluntness of her language surprised him at first, but later became a mutual joke. Rogers also testified that in Japan, he told Dahms that her career would advance more quickly if she would "tone down her dress a little bit." Finally, Matz and Woodyard testified that Dahms wore inappropriate and revealing clothing at work up until the time she filed the MCAD complaint.[21]

The MCAD has explained: "In determining whether a [c]omplainant has established that an environment is hostile or abusive, a totality of the circumstances must be considered."[22] *Canniff* v. *Power Print, Inc.*, 22 M.D.L.R. 339, 340 (2000). By claiming that she had been unwillingly subjected to such an environment, Dahms made relevant her own behavior in the workplace and with coworkers. However, evidence of a plaintiff's dress and conduct is not relevant per se; judges must take care to ensure that evidence of that nature is allowed only when its probative value outweighs the prejudicial impact to the plaintiff.

The judge did not abuse his discretion in admitting this evidence. The evidence of Dahms's language, apparel, and conduct, as described by Shillman, Rogers, Woodyard, and Matz, was probative of whether she was subjectively offended by her work environment or by Rogers's conduct. See *Canniff* v. *Power Print, Inc.*, *supra*. It concerned behavior in the workplace and at company events, or interactions with the defendants by whose conduct she claims to have been harassed. It was not admitted (nor admissible) as character evidence or to paint Dahms as a "loose" woman, predisposed to welcome any advances.[23]

Some evidence of Dahms's apparel was relevant for another

---

[21]The testimony of Matz and Woodyard regarding Dahms's attire at work was not objected to at trial on the grounds raised on appeal.

[22]The MCAD is charged with enforcing G. L. c. 151B and its "interpretation of its governing statute is entitled to substantial deference." *Bynes* v. *School Comm. of Boston*, 411 Mass. 264, 269 (1991).

[23]Other evidence of Dahms's conduct offered by the defendants was properly excluded. For example, on direct examination, Woodyard began to testify

purpose: to show Shillman's state of mind when he sent the e-mail to Woodyard asking for photographs and videotapes of Dahms taken at company events. Dahms alleged that this e-mail was part of "Cognex's and Shillman's brutal campaign of retaliation and harassment." Shillman wrote the e-mail after Dahms filed her MCAD complaint alleging that he had sexually harassed her and had created a hostile environment at the company. In these circumstances, Shillman was properly permitted to explain that he believed the photographs would show that Dahms was an "active participant in the environment at Cognex" (including the company parties), and that her claims of a hostile work environment were therefore "totally false."

Where her attorney was the first to elicit testimony about Dahms's clothing, and introduced photographs of Dahms, Shillman, and Cognex employees dressed in party costumes, the judge did not abuse his discretion in concluding that the defendants' evidence on this subject also should be admitted. Moreover, the judge appropriately engaged in a constant and careful weighing of probative value versus potential prejudice of evidence regarding the plaintiff's dress, speech, and conduct throughout the trial.

c. *The telephone call from Japan.* Dahms argues that the judge improperly excluded Denise Donovan's testimony about the substance of Dahms's telephone call to her from Japan. Hearsay "is generally inadmissible unless it falls within an exception to the hearsay rule." *Commonwealth* v. *Rice*, 441 Mass. 291, 305 (2004). On appeal, Dahms argues that the statements in the telephone call should have been admitted under the "state of mind" exception to that rule.

Dahms testified that after Rogers tried to push the door to her hotel room open and "was pounding" on the door, she "called my girlfriend . . . in the United States and told her what had just happened." When Rogers took the stand, he denied pushing

about Dahms's being intoxicated at a 1996 Cognex holiday party. The judge asked for a sidebar, and defense counsel explained that Woodyard would testify that she saw Dahms, who appeared intoxicated, in the restroom "stamping herself all over her body with a bingo stamp"; and that she saw Dahms leave the restroom, go over to the bar, and "creat[e] a little bit of a ruckus because the bartender wouldn't serve her any more alcohol." After a lengthy sidebar discussion, the judge concluded that the prejudicial impact of the testimony outweighed its value in demonstrating whether Dahms found the work environment to be sexually hostile.

or banging on the door. Dahms's counsel then called Donovan to rebut Rogers's testimony. Donovan testified that she received a telephone call from Dahms from Japan on the night in question. When she was asked to describe Dahms's "demeanor" during the call, the judge permitted her to testify (over defense counsel's objection) that Dahms "was upset." Defense counsel then objected to any further questions concerning what Dahms told Donovan about why she was upset. At sidebar, Dahms's counsel argued that the conversation fell under either the spontaneous utterance or state of mind exceptions to the hearsay rule.

The judge first concluded that the telephone statements made by Dahms were not spontaneous utterances. Dahms does not contest this ruling on appeal, and so we do not address it. Next, he rejected the state of mind exception as a basis for admitting the substance of the conversation. He reasoned that Dahms was sufficiently able to demonstrate her state of mind through Donovan's testimony that she sounded "upset" on the telephone, and ruled that Dahms's counsel could pursue further that subject ("how she said it, her tone of voice, if she was crying").[24] Finally, the judge noted that the testimony from Donovan that Dahms called her was, standing alone, relevant to rehabilitating Dahms in the face of earlier cross-examination (based on Dahms's deposition testimony) suggesting that Dahms was not being truthful about having made the call, and had gone directly to bed after Rogers left.

It was within the discretion of the judge to admit Donovan's testimony about the statements made by Dahms during the telephone call. "The state of mind exception to the hearsay rule allows the admission of extrajudicial statements to show the state of mind of the declarant if it is relevant to a material issue in the case." *Commonwealth* v. *Brooks*, 422 Mass. 574, 581 (1996). Dahms's statements were likely relevant to whether she was subjectively offended by Rogers's alleged advances. However, "[i]n assessing whether a judge has abused his discretion, 'we do not simply substitute our judgment for that of the judge, rather, we ask whether the decision in question rest[s] on whimsy, caprice, or arbitrary or idiosyncratic notions.' " *Massachusetts Ass'n of Minority Law Enforcement Officers* v. *Abban*, 434

---

[24]Dahms's counsel declined the judge's invitation, stating, "I'll probably leave it at that."

Mass. 256, 266 (2001), quoting *Boulter-Hedley* v. *Boulter*, 429
Mass. 808, 811 (1999). See *Davis* v. *Boston Elev. Ry.*, 235
Mass. 482, 502 (1920) (abuse of discretion defined as view or
action "that no conscientious judge, acting intelligently, could
honestly have taken"). The judge's ruling did not rise to the
level of an abuse of discretion where he permitted Donovan to
testify that Dahms contacted her and was upset on the telephone.

    d. *Evidence of movie's general release date.* Rogers was
called to the stand by Dahms and cross-examined by defense
counsel. During that cross-examination, Rogers testified to a
number of graphic stories Dahms had told him during a skiing
trip he took with Dahms in 1997 regarding sexual activity. He
also testified that, "I think it was" on this ski trip that Dahms
told him an off-color story relating to the movie "There's Some-
thing About Mary." Dahms's attorney attempted to elicit testi-
mony on redirect examination that the movie was not released
until 1998, in an effort to impeach his credibility. Rogers testi-
fied that he did not know when the movie was released. Shortly
after Rogers's testimony was completed, Dahms's attorney rested
without reserving any right to introduce further evidence about
the movie.

    Dahms's attorney later asked the judge to take judicial notice
of the movie's release date, and presented four movie "almanacs"
for the judge to read. The judge denied the request, reasoning
that the information did not fall into a category for which judicial
notice was appropriate. No evidence concerning the movie was
introduced during the defense case. However, near the conclu-
sion, Dahms's attorney asked to introduce "rebuttal testimony"
to address the date of the movie. The judge denied the request.

    The judge acted within his discretion. As the judge stated in
his ruling, quoting *Drake* v. *Goodman*, 386 Mass. 88, 94 (1982),
"a party would be well-advised to obtain the judge's ruling on
the matter of his right to present a rebuttal witness before rest-
ing his case-in-chief." Here, Dahms's attorney failed to propose
a proper method for introducing this evidence prior to resting.

    e. *Jury instruction on hostile work environment.* Dahms con-
tends that the judge gave an erroneous instruction on the claim
that Rogers and Shillman created a hostile work environment in
violation of G. L. c. 151B, § 4 (16A).

    For purposes of this claim, the relevant statute defines sexual

harassment as "sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when . . . such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment." G. L. c. 151B, § 1 (18). To prevail, Dahms was required to show that the "conduct alleged was sufficiently severe and pervasive to interfere with a reasonable person's work performance," *Muzzy* v. *Cahillane Motors, Inc.*, 434 Mass. 409, 411 (2001), and that she found the conduct "subjectively offensive." *Id.* at 412 n.2, quoting *Messina* v. *Araserve, Inc.*, 906 F. Supp. 34, 36 (D. Mass. 1995).

The judge gave a lengthy instruction on this claim, including several paragraphs on its subjective element. Dahms challenges a portion of one sentence in the instruction:

> "*If you find that Ms. Dahms was a willing participant in sexual behavior in her workplace,* or that she willingly participated with Mr. Rogers in sexual banter or discussions of a sexual nature, or that she did not consider his conduct offensive to her at the time it was occurring, *then she has not proven this subjective element of her hostile environment sexual harassment claim*" (emphasis added).

Shillman and Cognex had filed a number of requested jury instructions, including a request that the judge instruct that "[i]f you determine that Ms. Dahms was a willing and active participant in the atmosphere at Cognex . . . Ms. Dahms cannot prevail on her hostile work environment claim." Counsel for Dahms objected to this language at the charge conference, and the judge agreed to change it to "a willing and active participant in the *conduct of which she complains*," (emphasis added), to which Dahms's counsel replied, "That would be fine." The italicized language, however, did not appear in the actual instruction.[25]

We agree that, as given, the sentence objected to by Dahms

---

[25]At the conclusion of the jury instructions, counsel made their objections at a sidebar conference. One of the objections made by Dahms involved the instruction complained of on appeal. Specifically, counsel told the judge that "there was a sentence raised on the subjective standard in the hostile environ-

was an incorrect statement of the law to the extent that it suggested that a judgment for the defendants would be required if Dahms was a willing participant in *any* sexual behavior in her workplace. While it was proper for the jury to consider Dahms's behavior within Cognex in evaluating her hostile workplace environment claim, and evidence of her willing participation in sexualized behavior in the workplace was probative of whether she was subjectively offended by the work environment that she claims the defendants created, such evidence is not dispositive. The fact finder is not required to return a verdict for the defendants merely because the plaintiff participated in sexualized behavior with third-party coworkers. In *Canniff* v. *Power Print, Inc.*, 22 M.D.L.R. 339 (2000), for example, the MCAD upheld a hearing commissioner's determination that although an employee took part in sexual banter in the workplace, she was nonetheless subjectively offended by certain actions, and subjectively felt that the defendant created a hostile workplace.

The defendants rely on *Ramsdell* v. *Western Mass. Bus Lines, Inc.*, 415 Mass. 673, 678-679 (1993), for the proposition that the judge's charge was correct. The *Ramsdell* case, however, does not directly address this issue. In that case, the plaintiff filed hostile work environment claims against the company where the plaintiff was employed and her direct superior. *Id.* at 673 n.1. The hearing commissioner found that the plaintiff had " 'invited' or provoked [the] bawdy exchanges" with her supervisor that formed the basis of her claim; and for that reason concluded that she was not subjectively offended by the behavior she claimed created a hostile workplace. *Id.* at 675. This court affirmed, reasoning that the hearing officer's determination was based on substantial evidence. *Id.* at 677-678. The *Ramsdell* case does not support the judge's instruction that *any* sexual behavior in the workplace disqualifies a hostile environment claim against a particular defendant; it merely reaffirms the settled rule that a hostile workplace

_____

ment instruction . . . that said 'If you find that Ms. Dahms was a willing participant in sexual behavior in her workplace' and then went on to say 'if she has not proven the subjective element of her hostile environment sexual harassment claim,' and then there where two other clauses, but they were each using the word 'or.' We think that's not a correct statement of the law." Dahms's counsel then went on to note other objections not raised here. The judge engaged in conversation about those other objections, but there was no further discussion about the one challenged on appeal.

claim fails if the plaintiff was not subjectively offended by the particular conduct that formed that basis of the claim. The case does not validate this instruction.[26]

However, "[a]n error in jury instructions is not grounds for setting aside a verdict unless the error was prejudicial — that is, unless the result might have differed absent the error." *Blackstone* v. *Cashman*, 448 Mass. 255, 270 (2007), citing Mass. R. Civ. P. 61, 365 Mass. 829 (1974) and *Abramian* v. *President & Fellows of Harvard College*, 432 Mass. 107, 118-119 (2000). We are persuaded that no prejudice occurred. During his instruction, the judge repeatedly pointed the jury's attention toward the particular conduct alleged against Shillman and Rogers, which formed the basis of the hostile work environment claims.[27] In

[26]Modified slightly, the judge's instruction would be correct on this element:

> "To prove her claim of hostile environment sexual harassment against [the] defendant, [the plaintiff] must prove that she actually found the conduct to be hostile, intimidating, or threatening to her, and that it interfered with her work environment. In making this determination, you must consider the totality of the circumstances and the over-all atmosphere of the workplace, which can include any evidence, if there was any, of [the plaintiff's] sexual conduct toward [the defendant], as well as any evidence, if there was any, of sexual banter or comments she engaged in with other coworkers.
>
> "[In addition to the over-all atmosphere of the workplace, you must also consider the specific conduct of the defendant that the plaintiff claims was offensive.] If you find that [the plaintiff] was a willing participant [in that conduct] . . . or that she did not consider [that] conduct offensive to her at the time it was occurring, then she has not proven this subjective element of her hostile environment sexual harassment claim."

[27]For example, "[t]he plaintiff claims that she was subjected to a hostile work environment *by each of the defendants*"; "the plaintiff must prove by a preponderance of the evidence that . . . *the sexual advances, requests, or conduct* was in fact hostile, intimidating, or humiliating to the plaintiff, Ms. Dahms"; "[y]ou must determine whether the plaintiff, by her conduct or speech, indicated that *the conduct at issue* was unwelcome, not whether the plaintiff's actual participation in the conduct, if any, was voluntary"; "[i]n making the factual determination of unwelcome conduct, you must consider the plaintiff's subjective view of *the conduct at issue.* For example, whether the plaintiff took offense at the conduct, and *the degree to which the plaintiff initiated or was a willing participant in the conduct* would be relevant to your determination." (Emphases added.)

addition, the instruction related only to a single claim. Dahms does not allege error in the judge's instructions on her claims that Rogers engaged in quid pro quo sexual harassment, that Cognex and Shillman aided and abetted Rogers in this harassment, and that the defendants retaliated against Dahms when she complained. The jury rejected each of these claims, and in doing so, plainly found Dahms's testimony, which formed the basis of all of her claims, not to be credible.

*Judgment affirmed.*