NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

23-P-382                                        Appeals Court


   BLACKMAN'S POINT HOMEOWNERS' ASSOCIATION, INC., & others[1]  vs.
           NANCY BLACKMAN CALL, trustee,[2] & others.[3]


                      No. 23-P-382.

     Bristol.     October 23, 2023. - January 31, 2024.

         Present:  Green, C.J., Milkey, & Grant, JJ.


Manufactured Housing Community.  Contract, Settlement agreement.
     Consumer Protection Act, Unfair or deceptive act.  Real
     Property, Right of first refusal.  Landlord and Tenant,
     Reprisal against tenant.  Practice, Civil, Summary
     judgment, Consumer protection case.



     Civil action commenced in the Southeast Division of the
Housing Court Department on March 23, 2020.

     Motions for summary judgment and for judgment on the
pleadings were heard by Joseph L. Michaud, J.; a motion for
reconsideration also was considered by him; the case was heard
by Anne Kenney Chaplin, J.; and entry of judgment was ordered by
her.

_____

     [1] John Flanagan and Thomas Oram.

     [2] Of the Blackman Realty Trust.

     [3] Dana Lewis Blackman and Roger Bradford Blackman, as
trustees of the Blackman Realty Trust, and Blackman's Point R.V.
& Camping, LLC.

Donald M. Solomon for the plaintiffs.
Steven S. Broadley for the defendants.
Andrea Joy Campbell, Attorney General, & Daniel A. Less, Assistant Attorney General, for the Attorney General, amicus curiae, submitted a brief.

GRANT, J.  This appeal primarily concerns how the defendants (collectively, Blackmans) may divest themselves of a manufactured housing community (park) they own and operate.[4]  The question is whether the Blackmans may discontinue the use as a park and then sell the property, or whether the Blackmans must offer the property for sale with the park on it.  We conclude that the Blackmans relinquished their right to discontinue the park use under the terms of a settlement agreement executed in 1988 but remand for consideration of the Blackmans' alternative arguments, not addressed in the Housing Court, that the restrictions contained in the settlement agreement are unenforceable.  Separately, the homeowners' association and the two individual plaintiffs, John Flanagan and Thomas Oram,[5] argue that they should have been awarded damages under G. L. c. 186, § 18, and G. L. c. 93A for acts the Blackmans took in connection with trying to discontinue the park use.  We discern no error in

---

[4] The trustees of the Blackman Realty Trust are the record owners of the property where the park is located.  Blackman's Point R.V. & Camping, LLC, is the licensed operator of the park.

[5] Flanagan and Oram are tenants and association members.

the decision not to award damages under G. L. c. 186, § 18, but because the factual predicate for the tenants' claim for violation of G. L. c. 93A remains unresolved, we vacate the judgment on the G. L. c. 93A claim. Accordingly, we vacate the order allowing summary judgment for the Blackmans and declaring that they may discontinue the park use, affirm the judgment on the claim for violation of G. L. c. 186, § 18, and vacate the judgment on the claim for violation of G. L. c. 93A. The matter is remanded to the Housing Court for further proceedings consistent with this opinion.

Background. 1. Manufactured Housing Act. We begin with a description of the statutes governing the operation of manufactured housing communities, which is helpful to an understanding of the factual scenario. See Greenfield Country Estates Tenants Ass'n v. Deep, 423 Mass. 81, 82 (1996). "[M]anufactured housing communities provide a viable, affordable housing option to many elderly persons and families of low and moderate income." Id. at 83. However, manufactured housing units often cannot be relocated, which leaves the tenants of a manufactured housing community in peril if their landlord decides to stop operating the community.[6] See id. at 86. To

---

[6] In 1991, the legislature amended various statutes to replace the term "mobile home" with "manufactured housing." St. 1991, c. 481.

protect this vulnerable community, the Legislature enacted the Manufactured Housing Act, G. L. c. 140, §§ 32A-32S (Manufactured Housing Act or act). See Greenfield Country Estates Tenants Ass'n, supra, at 82-83. "The goal of the [act] is to avoid discontinuances of manufactured housing communities," id. at 86, and the act sets forth procedures that landlords must follow when seeking (1) a change of use or discontinuance of a manufactured housing community, see G. L. c. 140, §§ 32L (7A)-(9), or (2) to sell the land on which a manufactured housing community is located, see G. L. c. 140, § 32R.[7]

2. The park. The park is located on a parcel of over twelve acres of oceanfront land in the Brant Rock section of Marshfield. Tenants typically occupy the park for five months each year, from May 1 through September 30. During the months that the park is closed to tenants, they have the option to leave their manufactured housing units in the park.

In 1987, the homeowners' association and several individual tenants and association members filed suit against the Blackmans' predecessors-in-interest, who were also members of the Blackman family.[8] That complaint included allegations that

---

[7] Among other things, G. L. c. 140, § 32R, provides "tenants with a right of first refusal to purchase the property." Greenfield Country Estates Tenants Ass'n, 423 Mass. at 83.

[8] Because the distinction between the Blackmans and their predecessors-in-interest is immaterial to any issue in dispute,

the Blackmans wrongly attempted to discontinue the park use without following the procedures set forth in the act. To resolve the 1987 lawsuit, the parties entered into a settlement agreement dated March 22, 1988.

Pursuant to the terms of the settlement agreement, the Blackmans signed an appended document that granted to the homeowners' association a right of first refusal in the event of a sale of the park.[9] The settlement agreement also included a variety of terms governing the Blackmans' operation of the park, including (among other provisions) the following:

> "In each year succeeding 1988 in which the Blackmans do not notify the [homeowners'] [a]ssociation by April 1 of each such year of any bona fide offer to buy the [p]roperty that the Blackmans intend to accept, the Blackmans hereby agree to reopen the [p]ark for the period from May 1 through September 30 of each such year."

The Blackmans agreed "that they shall[] . . . obtain all necessary operating licenses" and provide certain services to

---

and because the ownership of the property and operation of the park have, at all relevant times, been in the Blackman family, we refer to the predecessors-in-interest also as the Blackmans.

[9] The Blackmans disputed that the homeowners' association or any individual tenants had a statutory right of first refusal pursuant to G. L. c. 140, § 32R, see note 7, supra, but agreed to grant the homeowners' association the right of first refusal incorporated into the settlement agreement. The settlement agreement further provided that if the homeowners' association exercises the right of first refusal and buys the park, it must continue to operate the park; if within five years of the purchase the homeowners' association sells any portion of the park, it must pay a financial penalty to the Blackmans.

the tenants until the sale of the property to the homeowners' association or the termination of the tenancies "pursuant to paragraph 10."  Paragraph 10 provided as follows:

> "In the event that the [homeowners'] [a]ssociation declines to exercise the right of first refusal granted to it by the Blackmans and so notifies the Blackmans, or in the event that the [homeowners'] [a]ssociation does not perform in accordance with the terms of [the right of first refusal], or in the event that the right of first refusal does not apply[,] . . . all tenancies . . . shall terminate sixty days after conveyance of the [p]roperty by the Blackmans to a bona fide third party and the recording of the deed."

Separately, the settlement agreement included provisions setting the rental rates for the 1988 season and limiting how rental rates could be increased in the future.

In 2014, the Blackmans filed suit in the Housing Court seeking to determine the parties' rights, duties, and responsibilities under the settlement agreement.  In part, the Blackmans sought to increase the rental rates to fair market rates.  The parties agreed to a stipulated judgment, which enjoined the Blackmans from raising the rental rates in excess of what the settlement agreement permitted and stated that the settlement agreement was "still in force and ha[d] not been amended, modified, or terminated by the parties in any respect, whether by this judgment or otherwise."  The stipulated judgment was signed by the parties and incorporated by a judge into an order for judgment on June 4, 2018.

Shortly before entering into the stipulation, by a letter dated March 29, 2018, the Blackmans notified the tenants as follows:  the Blackmans "intend to sell the land where the [p]ark is located and to take steps to begin the process of discontinuing its business."  The Blackmans followed the March 2018 letter with two additional letters dated June 12, 2018, and August 7, 2018, both of which stated the following:  (1) the Blackmans "intend to discontinue the use of the [p]ark and discontinue the [p]ark's business" and (2) "[t]he discontinuance will be effective as of the date two years after the date of this letter."  The June and August 2018 letters explained,

> "The owners are taking this step because, although this has been a family owned and operated business for many decades, the family has concluded that the financial and management burdens of the [p]ark are now too great.  The family as a whole intends to divest itself of this burden and pursue other objectives."

The Blackmans' efforts to discontinue the park use prompted the instant lawsuit, in which the homeowners' association and the individual plaintiffs alleged that (1) under the terms of the settlement agreement, the Blackmans relinquished their right to discontinue the park use, (2) even if the Blackmans could discontinue the park use, they did not follow the statutory procedures, and (3) the Blackmans' acts were retaliatory and

unfair or deceptive.[10]  On summary judgment, a Housing Court judge (motion judge) concluded that the Blackmans could discontinue the park use if they complied with the procedures set forth in G. L. c. 140, § 32L.  Subsequently, following a bench trial, a different Housing Court judge (trial judge) concluded that the Blackmans followed the statutory procedures for discontinuance and that the Blackmans' acts were neither retaliatory nor unfair or deceptive.

Discussion.  1.  Discontinuance.  The Blackmans candidly acknowledge that they want to discontinue the park use before

---

[10] In an amicus brief submitted to this court, the Attorney General also asserted that the Blackmans did not follow the statutory procedures for discontinuance pursuant to G. L. c. 140, §§ 32L, 32R.  The Attorney General explained that the act provides two ways that landlords of manufactured housing communities may dispose of their communities.

> "[Landlords] can sell [their communities] pursuant to § 32R, which triggers the [tenants'] opportunity to exercise a statutory right of first refusal . . . to purchase the community and own and operate it as a coop, or [landlords] can discontinue [their communities] pursuant to §§ 32L (7A)-(9), which requires them to notify residents what they intend to do with the property following the [discontinuance].  They cannot have it both ways and sell the property after they have strategically removed all the residents in a discontinuance."

The Attorney General asserted that the Blackmans' act of seeking to discontinue the use of the park and then sell the property was in violation of those statutory procedures.  Because it remains uncertain whether the restriction in the settlement agreement on discontinuing the use is enforceable, we do not reach this issue.

selling the property because they believe that the property is more valuable without the park on it. However, the park's tenants also have rights.

If the Manufactured Housing Act were the only authority that controlled this case, the Blackmans could discontinue the park use by following the statutory procedures.[11] However, the settlement agreement altered the parties' rights and responsibilities. The motion judge construed the settlement agreement as silent on the question of whether the Blackmans could simply discontinue the park, without first offering it for sale either to a third party or to the homeowners' association. To resolve what he perceived as an ambiguity created by that omission, the motion judge read the terms of the Manufactured Housing Act into the settlement agreement, particularly G. L. c. 140, § 32L, which governs the termination of manufactured housing communities.

That is not an accurate reading of the settlement agreement. Under the settlement agreement, the Blackmans "agree[d] to reopen the [p]ark" each year in which the Blackmans did not notify the homeowners' association of a bona fide offer to buy the property that the Blackmans intended to accept. The

_____

[11] As discussed, see note 10, supra, we do not reach the question whether the act would permit a landlord of a manufactured housing community to discontinue the community only to sell the property.

Blackmans also agreed to continue obtaining all necessary operating licenses and to continue providing certain services to the tenants. The settlement agreement mentioned termination of the tenancies only in the context of a sale. This language is unambiguous. According to the plain meaning of the settlement agreement, the Blackmans agreed to relinquish the right to discontinue the park use and, instead, agreed to continue opening and operating the park for so long as they owned it. See A.L. Prime Energy Consultant, Inc. v. Massachusetts Bay Transp. Auth., 479 Mass. 419, 431 (2018) ("we analyze the contract according to the principle that '[w]hen contract language is unambiguous, it must be construed according to its plain meaning'" [citation omitted]).

While the settlement agreement did not contain the precise words that the Blackmans "shall not discontinue" the park use, that does not alter our conclusion. The provisions requiring the Blackmans to continue opening and operating the park simply worded the double negative "shall not discontinue" as affirmative statements describing the Blackmans' obligations to continue operating the park. Accordingly, we are unpersuaded by the Blackmans' argument that (1) the settlement agreement is silent on the issue of discontinuance, (2) the Manufactured Housing Act supplies the missing terms for how the Blackmans may discontinue the park use, and (3) we should read the act's terms

into the settlement agreement. While it is true that the general rule is that the "law existing at the time an agreement is made necessarily enters into and becomes part of the agreement," see Feakes v. Bozyczko, 373 Mass. 633, 636 (1977), here the argument flounders on its factual premise. The settlement agreement is not silent on discontinuance. Rather, it precludes discontinuance by requiring the Blackmans to continue to operate the park unless they sell it, in which case they must first permit the homeowners' association to exercise the right of first refusal. The Blackmans contracted away the right to discontinue the park. We cannot read the statutory procedures for discontinuance into a settlement agreement that precludes discontinuance. See 11 R.A. Lord, Williston on Contracts § 30.19 (4th ed. 2012) (doctrine of incorporating applicable existing law into contract does not apply "when a contrary intention is evident").

We are also unpersuaded by the Blackmans' contention that the statute regulating discontinuance of a manufactured housing community, G. L. c. 140, § 32L, confers an independent "right" to discontinue the use of the property for manufactured housing. To the contrary, the statute does not create a "right" to discontinue use; instead, it imposes limits on any such discontinuance. In the present case the parties contracted in the settlement agreement to supplement the statutory limitations

on discontinuance with further protections for the homeowners, including (as we have explained) an affirmative agreement to continue operating the park until any sale, and the establishment of a right of first refusal for the homeowners' association.[12]

On summary judgment, the Blackmans argued in the alternative that the settlement agreement's prohibition against discontinuance is a perpetual restraint on alienation, violates the rule against perpetuities, or is a negative easement restricting the use of real property which under G. L. c. 184, § 23, would be limited to a term of thirty years.[13]  The motion

---

[12] Given our conclusion, we decline to address whether the Blackmans followed the statutory procedures for discontinuance, G. L. c. 140, § 32L.  To the extent that the homeowners' association and the individual plaintiffs argue that many of the Blackmans' acts in seeking to discontinue the use of the park were unfair or deceptive in violation of G. L. c. 93A, we address those arguments infra.

[13] The restrictions contained in the 1988 settlement agreement, being personal to the homeowners' association, are not negative easements.  See Snow v. Van Dam, 291 Mass. 477, 480-481 (1935).  We take no position whether they nonetheless constitute restrictions on the use of property for the purposes of G. L. c. 184, § 23.  We note that in Bortolotti v. Hayden, 449 Mass. 193, 202-205 (2007), the Supreme Judicial Court ruled that the right of first refusal in that case was not subject to the rule against perpetuities.  The court noted, however, that "A court might use the thirty-year window imposed by G. L. c. 184, § 23, and G. L. c. 184A, § 5, as a general guide, . . . and, if more than thirty years have passed since the creation of a right of first refusal not subject to G. L. c. 184A, § 5, and circumstances otherwise demonstrate a good reason not to enforce the right, then enforcement could be declined on equitable

judge declined to reach those issues, instead granting summary judgment on the sole ground that G. L. c. 140, § 32L, permitted the Blackmans to discontinue the park use. We decline to address those issues where the judge did not address them. See Merrimack College v. KMPG LLP, 480 Mass. 614, 629 (2018). In these circumstances, we vacate the order granting summary judgment and remand the case to the Housing Court for consideration of the Blackmans' three other grounds for summary judgment.

2. Damages. The homeowners' association and individual plaintiffs also assign error to the trial judge's decision not to award damages under G. L. c. 186, § 18, and G. L. c. 93A.

General Laws c. 186, § 18, prohibits

"[a]ny person or agent thereof [from] threaten[ing] to or tak[ing] reprisals against any tenant of residential premises for the tenant's act of, commencing, proceeding with, or obtaining relief in any judicial or administrative action the purpose of which action is to obtain damages under, or otherwise enforce, any [F]ederal, [S]tate or local law, regulation, [bylaw] or ordinance, which has as its objective the regulation of residential premises."

The statute creates a presumption of retaliation where "notice . . . of any substantial alteration in the terms of tenancy [is received by the tenant] within six months after the tenant has commenced, proceeded with, or obtained relief in such action."

---

grounds." Id. at 205 n.10. We express no opinion on whether such circumstances are present here.

Id.  The presumption is rebutted only by clear and convincing evidence that the "action was not a reprisal against the tenant" and that the person taking the action "had sufficient independent justification for taking such action, and would have in fact taken such action, in the same manner and at the same time the action was taken, regardless of tenants engaging in, or the belief that tenants had engaged in, activities protected under this section."  Id.

The homeowners' association and individual plaintiffs argue that the trial judge erred in concluding that they were not entitled to a presumption of retaliation, where the Blackmans sent the discontinuance notices within six months of the judgment in the 2014 lawsuit, which entered on June 4, 2018. However, the trial judge credited the testimony of Nancy Blackman Call that discussions regarding what to do with the park started well before 2018, that she was eighty-four years old, that her children were "not young either," and that no one in the family wanted to run the business.  The trial judge also credited Blackman Call's testimony that the decision to try to discontinue the park was not in retaliation for the prior lawsuit, but as a result of the fact that no one in the family wanted to run the business.  These credibility determinations as to the Blackmans' intent supported the judge's conclusion that the Blackmans had not retaliated against "the plaintiff's

actions in engaging in statutorily protected activity." We construe the trial judge's handling of the issue as, perhaps inartfully, saying that there was no showing of retaliation, despite the presumption, because Blackman Call's testimony constituted the sort of clear and convincing evidence necessary to overcome the presumption. Thus, even if the trial judge erred in concluding that the presumption of retaliation did not apply, the error was not prejudicial. Cf. Dahms v. Cognex Corp., 455 Mass. 190, 207-208 (2009) (judgment affirmed where, despite erroneous jury instruction, credibility of witness was determinative).

The homeowners' association and individual plaintiffs also argue that many of the Blackmans' acts in seeking to discontinue the park use amounted to unfair or deceptive acts or business practices in violation of G. L. c. 93A. Primarily, the homeowners' association and individual plaintiffs rely on the notices of discontinuance, which they assert sowed confusion as to whether the homeowners' association would have an opportunity to exercise its right of first refusal and, thus, whether the tenants needed to vacate the property. The trial judge disagreed, but her reasoning was predicated on the motion judge's ruling that the settlement agreement did not restrict the Blackmans from requiring the tenants to vacate the property

as part of a discontinuance process.[14]  In light of our conclusion and the need to remand for further consideration of the Blackmans' summary judgment arguments, we also remand the plaintiffs' G. L. c. 93A claim for further consideration of whether the notices of discontinuance unfairly or deceptively sowed confusion as to whether the tenants needed to vacate the park.[15]

Conclusion.  So much of the judgment as declared that the Blackmans may discontinue the use of the park is vacated.  The judgment on the claim for violation of G. L. c. 186, § 18, is affirmed, and the judgment on the claim for violation of G. L. c. 93A is vacated.  The matter is remanded to the Housing Court for further proceedings consistent with this opinion.[16]

---

[14] The trial judge found that the Blackmans intended to comply with the right of first refusal during the discontinuance process and that any belief to the contrary was unreasonable. This finding assumes that the Blackmans could require the tenants to vacate the property in a discontinuance and then comply with the right of first refusal.

[15] The Blackmans argue that we should affirm the finding of no liability on the G. L. c. 93A claim because there was no evidence of an injury.  See Tyler v. Michaels Stores, Inc., 464 Mass. 492, 503 (2013).  However, there was testimony that some tenants moved out of the park, that the homeowners' association now has fewer members, and that, as a result, it will be more difficult for the homeowners' association to exercise its right of first refusal.  Whether there was an injury, therefore, is a matter best left to the trial judge in the first instance on remand.

[16] The homeowners' association and individual plaintiffs request appellate attorney's fees.  That request is denied.

<u>So ordered</u>.