# United States Court of Appeals
## For the First Circuit

No. 23-1870

SUSAN O'HORO, M.D.,

Plaintiff, Appellant,

v.

BOSTON MEDICAL CENTER CORPORATION; BOSTON UNIVERSITY MEDICAL
CENTER RADIOLOGISTS, INC.; and JORGE SOTO, M.D.;

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]
[Hon. Jennifer C. Boal, U.S. Magistrate Judge]

---

Before

Gelpí, Montecalvo, and Aframe,
Circuit Judges.

---

Edward Foye, with whom Lisa G. Arrowood, Sarah E. A. Sousa,
and Arrowood LLP were on brief, for appellant.

David C. Kurtz, with whom Jonathan D. Persky and Constangy,
Brooks, Smith & Prophete LLP were on brief, for appellees.

---

February 21, 2025

**GELPÍ**, **Circuit Judge**. This suit arises from a doctor's efforts to report -- internally and externally -- misconduct at a hospital. Plaintiff-Appellant Susan O'Horo ("Dr. O'Horo") was employed by Boston University Medical Center Radiologists, Inc. ("BUMCR") as an interventional radiologist and the Director of Quality and Safety in the Interventional Radiology ("IR") Division at Boston Medical Center Corporation ("BMC"). She was responsible for, among other things, reviewing and investigating safety reports based on complications that occurred during medical procedures. But Dr. O'Horo insists that she was unable to effectively carry out her duties and correct safety concerns because her workplace was permeated by discriminatory and retaliatory animus. Indeed, she asserts that the workplace was so harsh that she was ultimately compelled to resign in January 2020.

Thereafter, on December 29, 2020, Dr. O'Horo filed suit in the United States District Court for the District of Massachusetts against BUMCR, BMC, and Dr. Jorge Soto (collectively, "Defendants-Appellees"). As relevant to the instant appeal, Dr. O'Horo brought claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a) ("Title VII"); the corresponding Massachusetts law, Mass. Gen. Laws ch. 151B ("Chapter 151B"); and the Massachusetts Health Care Whistleblower Act, Mass. Gen. Laws ch. 149, § 187 ("MHCWA"). On November 21, 2022, Defendants-Appellees moved for summary judgment. United

States Magistrate Judge Jennifer C. Boal issued a report and recommendation ("R&R") granting the motion, which United States District Court Judge George A. O'Toole, Jr. adopted in its entirety. Dr. O'Horo appealed.

For the reasons explained below, we **affirm**.

## I.

### A. Factual Background

We draw the facts from the summary judgment record that was before the district court, see Boykin v. Genzyme Therapeutic Prods., LP, 93 F.4th 56, 58 (1st Cir. 2024), and "we array [them] in the light most favorable to the nonmoving party," Alam & Sarker, LLC v. United States, 113 F.4th 153, 158-59 (1st Cir. 2024) (quoting AJ Mini Mkt., Inc. v. United States, 73 F.4th 1, 4 (1st Cir. 2023)).

#### 1. Dr. O'Horo's Role at BMC

Dr. O'Horo is an interventional radiologist. Unlike diagnostic radiologists, who use non-invasive technology for diagnostic purposes, interventional radiologists employ minimally invasive, image-guided procedures to both diagnose and treat disease. As with all medical procedures, patient safety is a priority.

In 2017, BUMCR[1] created the position of Director of Quality and Safety in the IR Division. And in February 2018, BUMCR hired Dr. O'Horo to do the job. In that new role, Dr. O'Horo claims that she had a duty to oversee and improve the culture of safety within the IR Division at BMC, including by developing and implementing quality and safety initiatives and procedures, setting up a formal process to review and document complications, and reviewing and investigating any reports filed through BMC's complication tracking system, STARS.

Dr. O'Horo, however, worked under superiors at BMC, and there was overlap between her mandate to monitor patient safety and the duties of other, more senior employees. For instance, Dr. Rajendran Vilvendhan ("Dr. Vilvendhan"), as the Division Chief of IR, was responsible for the "overall conduct" of the IR Division, including an obligation to oversee the professional performance of all physicians with clinical privileges; the development and implementation of policies and procedures to enhance the provision of care; and the continuing duty to evaluate and improve the quality of care. Likewise, Dr. James Moses ("Dr. Moses") was BMC's Chief Quality Officer and played a significant role in overseeing patient quality and safety in IR. And there were others who

---

[1] BUMCR is a professional corporation that employs radiologists to practice medicine at BMC, an academic medical center in Boston, Massachusetts.

monitored quality and safety at BMC, such as Dr. Soto, who was BMC's Chief of Radiology, BUMCR's president, and Dr. O'Horo's direct supervisor; Dr. Ravin Davidoff ("Dr. Davidoff"), BMC's Chief Medical Officer; Scott Friedman, BMC's Chief Risk Officer; and Laura Harrington, BMC's Executive Director for Quality and Patient Safety.

### 2. Dr. O'Horo Reports Misconduct

Shortly after Dr. O'Horo began her job at BMC, she learned of a host of troubles related to Dr. Mikhail Higgins ("Dr. Higgins"). These issues are largely undisputed, and so too are Dr. O'Horo's efforts to intervene.

Dr. O'Horo's involvement began in June 2018, after a nursing manager, Stephanie Martinez, complained about Dr. Higgins's negative effect on the morale of nursing staff. To address a myriad of concerns related to Dr. Higgins, Dr. O'Horo sent an email to Dr. Soto on June 8, 2018, in which she suggested that Dr. Higgins's procedures be observed. Dr. Soto responded by email stating, "Thanks for your diligence and hard work. I suggest we meet (hopefully Monday) to discuss the points below, especially those pertaining to [Dr. Higgins]." Although Dr. O'Horo believed that Dr. Soto was being insincere, they did devise a plan to supervise Dr. Higgins.

Still, quality and safety issues persisted throughout the IR Division. Dr. Higgins was the main culprit, leading some

- 5 -

technologists and other staff members at BMC to dub him "the Boston Butcher."  Dr. O'Horo continued to track in a Microsoft Excel spreadsheet Dr. Higgins's misadventures, and to report them.  In the fall of 2018, she reiterated to Dr. Soto her concerns about Dr. Higgins.  On January 10, 2019, Dr. Soto privately asked Dr. Vilvendhan to review one of the cases that Dr. O'Horo had raised.  Believing that Dr. Soto had failed to act, Dr. O'Horo brought her complaints to Dr. Moses.

Dr. Moses had some reservations about Dr. O'Horo's reporting.  For instance, he was concerned about Dr. O'Horo's recordkeeping: she did not use the STARS reporting system in accordance with BMC's policy,[2] opting instead to track issues in an ad hoc spreadsheet, which was maintained on BMC's local desktop computer, rather than submitted to a protected and centrally located workspace, and thus prevented timely review of complications.  Moreover, Dr. Moses took issue with Dr. O'Horo's

---

[2] Defendants-Appellees claim that Dr. O'Horo should have reported quality and safety concerns in the STARS system. According to BMC policy, STARS reports are to be filed by any individual who identifies a reportable event, and the reporter's immediate supervisor should ensure that an incident report is timely completed.  STARS reports are then reviewed by BMC's Patient Safety Steering Committee ("PSSC"), which is composed of the Chief Nursing Officer, the Chief Quality Officer, Risk Managers, the Executive Director of Quality and Patient Safety, and representatives from the patient advocacy and legal teams.  Dr. O'Horo contends that she was not informed of her duties related to STARS, but she does not dispute that her preferred method of tracking complications prevented timely review by PSSC and other BMC officials.

hyperfocus on Dr. Higgins's issues and her punitive, instead of remedial, approach to correcting such issues. Nevertheless, Dr. Moses was alarmed by Dr. Higgins's complications, as reflected in the spreadsheet.

Although Dr. O'Horo contests whether Dr. Moses seriously considered the issues she raised, she does not dispute that Dr. Moses took certain steps to address them. First, he met with BMC's Chief Medical Officer, Dr. Davidoff, who expressed concerns about a potential conflict between Dr. O'Horo and Dr. Higgins. Then, on January 23, 2019, Dr. Moses sent to Dr. Soto an email explaining, among other things, that he was concerned with Dr. Higgins's competency and that Dr. Davidoff had "told [him] . . . about the interactive and emotional intelligence issues [Dr. O'Horo was] having that make the issue with [Dr. Higgins] not so clear." Dr. Moses testified that he left the conversation with Dr. Davidoff "specifically concerned [about] Dr. O'Horo's lack of situational awareness and self-awareness, as to why she did not perceive her processes [as] flawed and potentially biased against Dr. Higgins."

The next day, Dr. Soto contacted Drs. O'Horo and Vilvendhan, expressing concerns about delays in completing Dr. Higgins's evaluations and reiterating that Dr. Higgins's cases were a priority. Dr. Soto laid the blame primarily at Dr. O'Horo's feet. Dr. O'Horo disputes whether she was the sole reason for this shortfall.

### 3. Dr. O'Horo Sounds the Alarm

Dr. Higgins's performance-related issues persisted unabated well into 2019. So Dr. O'Horo sent a letter to Dr. Davidoff and Scott Friedman on September 13, 2019, outlining her concerns about Dr. Higgins and attaching her updated spreadsheet of quality and safety issues. She further demanded "an objective investigation as [she had] concerns that Dr. Soto and Dr. Vilvendhan" were biased and "may [have] even be[en] protecting Dr. Higgins." She expressly noted that she was "reporting these matters . . . under Massachusetts General Laws, Chapter 149, Section 187, because [she] believe[d] they pose[d] a risk to [the] patients and to public health."

Dr. Davidoff testified that BMC quickly developed a plan to address Dr. O'Horo's concerns in the September 2019 letter. The response consisted of both an internal and external review; the former led by Dr. Vilvendhan, and the latter conducted by an outside reviewer. In meetings with Dr. Moses, Dr. O'Horo voiced concerns about Dr. Vilvendhan's role in the internal review because of his apparent biases regarding Dr. Higgins and because she felt it was a usurpation of her role as the Director of Quality and Safety. Dr. Moses later testified that he believed the external review would guard against bias in the internal review, whether of Dr. Vilvendhan, Dr. O'Horo, or any other IR provider.

In addition, Dr. O'Horo was invited to and attended meetings with several supervisors and administrators at BMC. She first met with Dr. Davidoff, during which Dr. O'Horo brought up various topics, including Dr. Higgins's disproportionate number of clinical complications, Dr. Soto's leadership, and the Radiology Department more generally. It is undisputed that Dr. Davidoff listened to Dr. O'Horo and promised to follow up on the issues she had raised. On October 3, 2019, Dr. O'Horo attended another meeting -- this time, with Drs. Davidoff and Moses and Laura Harrington, the Executive Director for Quality and Patient Safety. There, they discussed, among other things, Dr. O'Horo's letter, the supporting documentation, and each case that Dr. O'Horo had listed. Dr. O'Horo felt optimistic that her concerns would be addressed.

That optimism was short-lived. On December 7, 2019, Dr. O'Horo filed another complaint -- this time, externally, with the Massachusetts Department of Public Health ("DPH"). She alleged that BMC "fail[ed] to fully and adequately report complications caused by Dr. Higgins," and that Dr. Vilvendhan's bias in favor of Dr. Higgins corrupted BMC's internal review into Dr. Higgins's alleged misconduct. She requested an "immediate[] investigat[ion]" into "the complications caused by Dr. Higgins and BMC's repeated failure to fully and adequately report said complications."

- 9 -

On December 11, 2019, BMC began the internal review process. Dr. Vilvendhan first reviewed another doctor's procedures and then, a day later, Dr. Higgins's procedures. But then the internal review process was halted when DPH began its on-site review of BMC. During the four-day review, DPH examined BMC's medical staff bylaws and various records, including medical records, licensing records for physicians in the IR Division, incident reports, hospital complaint reports, committee reports, trustee minutes, and patient safety data. It also observed IR procedures and interviewed at least ten physicians and hospital employees, including Drs. O'Horo, Soto, and Higgins. The notes maintained by DPH investigators do not indicate that Dr. O'Horo complained of gender discrimination.

Following DPH's on-site review, the internal review process resumed. As relevant here, Dr. O'Horo was reviewed by Dr. Vilvendhan on January 2, 2020. Shortly thereafter, Dr. O'Horo avers, a schedule of additional reviews was released, showing Dr. O'Horo scheduled to be observed more than her male colleagues. Notwithstanding the scheduling discrepancy, it is undisputed that Dr. O'Horo was, in fact, observed by Dr. Vilvendhan only one time.

On January 23, 2020, DPH informed BMC that Dr. O'Horo's complaint was "unsubstantiated," concluding that there were no violations of federal regulations promulgated by the Centers for Medicare and Medicaid Services. DPH still held a final meeting

with BMC officials to share with them "clear opportunities to improve services in IR."[3]

### 4. Dr. O'Horo's Departure from BMC

Three days before DPH released its findings to BMC, Dr. O'Horo resigned.  In Dr. O'Horo's January 20, 2020 resignation letter to Drs. Davidoff, Moses, and Soto, she claimed that she had been "constructively discharged . . . effective immediately." She stated that "the working conditions ha[d] become so intolerable that [she] c[ould] no longer work at BMC."  In text messages to colleagues from around that time, Dr. O'Horo expressed, among other things, that she was relieved to have left BMC, she had strategically timed her exit to bolster her legal case, and she had hoped that her departure would reflect poorly on Dr. Soto.

## B. Procedural History

On August 20, 2020, Dr. O'Horo filed with both the Massachusetts Commission Against Discrimination and the U.S. Equal Employment Opportunity Commission a charge against BMC, BUMCR, and Dr. Soto.  The charge alleges that Dr. O'Horo endured gender discrimination and eventually was constructively discharged for

---

[3] In January 2020, BMC also engaged an outside consulting agency, The Greeley Company ("Greeley"), to conduct the external review of the IR division.  Dr. O'Horo contends that she was excluded from the process for selecting external reviewers.  In any event, Greeley's report, issued in April 2020, found that of the thirty-five cases involving Dr. Higgins that it had reviewed, eighteen were considered "not appropriate," ten were deemed "questionable," and only seven were adjudged as appropriate.

- 11 -

"her complaints [to DPH] and BMC's retaliation stemming therefrom." On December 29, 2020, Dr. O'Horo filed suit in the United States District Court for the District of Massachusetts, asserting the following claims: gender discrimination in violation of Title VII and Chapter 151B; aiding and abetting gender discrimination in violation of Chapter 151B, § 4; retaliation in violation of MHCWA; and respondeat superior against BUMCR.

On November 21, 2022, following considerable discovery, Defendants-Appellees moved for summary judgment on all counts, and the parties completed briefing.[4] The district court, adopting in its entirety the R&R issued by the magistrate judge, granted Defendants-Appellees' motion as to all of Dr. O'Horo's claims. The district court held that Dr. O'Horo's disparate-treatment claims that accrued before October 25, 2019, were time barred; that the timely disparate-treatment claims failed because there was no materially adverse employment action; that the hostile work environment claim was insufficient because the workplace was not objectively hostile or abusive; that the aiding and abetting claim flunked alongside the dismissed Chapter 151B claims because it was entirely derivative thereof; and that the MHCWA claim faltered

---

[4] At a hearing on May 31, 2023, Dr. O'Horo consented to the dismissal of her Title VII claims against Dr. Soto and her respondeat superior claim against BUMCR.

- 12 -

because Dr. O'Horo established neither a prima facie case nor pretext.

Dr. O'Horo timely appealed.

## II.

### A. Standard of Review

We review de novo a district court's grant of summary judgment, affirming if we agree that the record evinces no genuine dispute of material fact and "reflects the movant's entitlement to judgment as a matter of law." Mullane v. U.S. Dep't of Just., 113 F.4th 123, 130 (1st Cir. 2024) (quoting McKenney v. Mangino, 873 F.3d 75, 80 (1st Cir. 2017)). "[A] fact is 'material' if it 'has the capacity to change the outcome of the [factfinder's] determination.'" Alam & Sarker, LLC, 113 F.4th at 161 (second alteration in original) (quoting Irobe v. U.S. Dep't of Agric., 890 F.3d 371, 377 (1st Cir. 2018)). "[A]n issue is 'genuine' if the evidence would enable a reasonable factfinder to decide the issue in favor of either party." Id. (quoting Irobe, 890 F.3d at 377).

### B. Title VII and Chapter 151B

We begin with Dr. O'Horo's gender discrimination claims under Title VII and Chapter 151B. Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or

- 13 -

privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Massachusetts law similarly prohibits an employer from discriminating against an employee on the basis of sex. Mass. Gen. Laws ch. 151B § 4(1). Under both Title VII and Chapter 151B, a plaintiff can bring claims for disparate treatment or hostile work environment, and Dr. O'Horo does so. See Espinal v. Nat'l Grid NE Holdings 2, LLC, 693 F.3d 31, 34-36 (1st Cir. 2012). Despite differences between the statutes and the analyses, for reasons that will become apparent, we address the Title VII and Chapter 151B claims together.

### 1. Disparate-Treatment Claim

At the outset, we note that the district court held -- and Dr. O'Horo does not challenge on appeal -- that the claims that accrued before October 25, 2019, are time barred. So we review only the claims that are alleged to have accrued on or after October 25, 2019, with the understanding, however, that the 300-day limitation period does not preclude us from considering "as background evidence" the pre-October 25, 2019 acts. Ramírez Rodríguez v. Boehringer Ingelheim Pharms., Inc., 425 F.3d 67, 78 n.14 (1st Cir. 2005) (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002)).

"In disparate-treatment cases, plaintiffs bear the ultimate burden of proving that they were the victims of intentional discrimination." Espinal, 693 F.3d at 34 (quoting Udo

- 14 -

v. Tomes, 54 F.3d 9, 12 (1st Cir. 1995)).  Such discrimination must be motivated by the plaintiff's status as a member of a protected class.  42 U.S.C. § 2000e-2(a); Mass. Gen. Laws ch. 151B § 4(1).  Direct evidence of discriminatory intent is not required, but where, as here, it is not present, we employ the familiar burden-shifting framework outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973), "to assess whether we can infer discrimination from the undisputed material facts."  Ing v. Tufts Univ., 81 F.4th 77, 82 (1st Cir. 2023) (quoting Theidon v. Harvard Univ., 948 F.3d 477, 495 (1st Cir. 2020)).

At the first step of that burden-shifting framework, the plaintiff must establish her prima facie case, the elements of which "var[y] according to the nature of [her] claim."  Cherkaoui v. City of Quincy, 877 F.3d 14, 24 (1st Cir. 2017) (quoting Alvarado-Santos v. Dep't of Health of P.R., 619 F.3d 126, 132 (1st Cir. 2010)); see also Ahern v. Shinseki, 629 F.3d 49, 54 (1st Cir. 2010) ("The elements of the prima facie case depend upon the particular type of employment decision at issue." (citation omitted)).  As relevant here, Dr. O'Horo must put forth some evidence to demonstrate that: (1) "she is 'a member of a protected class,'" (2) "she is 'qualified' for the job," (3) "she has 'suffer[ed] an adverse employment action at the hands of her employer,'" and (4) "there is 'some evidence of a causal connection between her membership in a protected class and the adverse

- 15 -

employment action.'" Stratton v. Bentley Univ., 113 F.4th 25, 38 (1st Cir. 2024) (alteration in original) (quoting Luceus v. Rhode Island, 923 F.3d 255, 258 (1st Cir. 2019)).

Once a plaintiff makes that "modest showing[, it] raises an inference of intentional discrimination," which "shifts the burden of production to the employer to articulate a legitimate, nondiscriminatory reason for the challenged employment decision." Ahern, 629 F.3d at 54. If the defendant-employer does so, the presumption of intentional discrimination "vanishes." Smith v. Stratus Comput., Inc., 40 F.3d 11, 16 (1st Cir. 1994). The "burden of production [then] reverts to the plaintiff," who must proffer evidence tending "to show that the defendant's stated reason for [the adverse employment action] was a pretext for discrimination." Boykin, 93 F.4th at 60 (second alteration in original) (quoting Udo, 54 F.3d at 12).

Applying that framework to the instant appeal, we begin with Dr. O'Horo's prima facie case. There is no dispute that Dr. O'Horo is a woman and thus a member of a protected class. And the parties do not quibble over Dr. O'Horo's qualifications. Much of the sparring occurs at the third and fourth elements -- i.e., whether Dr. O'Horo has demonstrated an adverse employment action that was motivated by her gender.

Dr. O'Horo presses two distinct but overlapping theories to establish an adverse employment action. First, she argues that

her constructive discharge constitutes an adverse employment action. In essence, she claims that she "had been so stripped of actual authority for patient safety and so prevented from fulfilling her job duties" that she was effectively demoted and thus felt compelled to resign. See Cherkaoui, 877 F.3d at 29-30 (describing the standard for constructive discharge under both Chapter 151B and Title VII). Her second theory arises on the heels of the Supreme Court's decision in Muldrow v. City of St. Louis, 601 U.S. 346 (2024). She contends that Muldrow requires Title VII plaintiffs to show only that an employment action resulted in "some harm respecting an identifiable term or condition of employment," and in that way, the discrete but less significant actions that underlie her constructive discharge theory can now independently support her disparate-treatment claim. Id. at 355. Put differently, Dr. O'Horo argues that because Muldrow "lowers the bar Title VII plaintiffs must meet," employment actions that we previously would have found to be immaterial standing alone, and thus unactionable under Title VII, are now sufficient as long as the action caused her some harm. Id. at 356 n.2. Under that lowered threshold, Dr. O'Horo insists, each action that reallocated or whittled her duties -- even if not "formally labeled" as such -- constituted an actionable adverse employment action.

Accordingly, Dr. O'Horo now contends that the following actions can independently serve as the basis of her discrimination claims: (1) the usurpation of her duties related to the investigation into Dr. Higgins, (2) the scheduling discrepancy and Dr. Vilvendhan's one review of her clinical work, (3) the hostile work environment to which she was subjected, and (4) constructive discharge based on her constructive demotion. We address each argument in turn.

## (a) Usurpation of Duties

We begin with Dr. O'Horo's contention that Defendants-Appellees discriminated against her by usurping her duties related to the investigation into Dr. Higgins's misconduct. We "bypass the prima facie case issue," however, and proceed to step two of the McDonnell Douglas framework because Dr. O'Horo "has not mustered enough evidence for a reasonable jury to conclude that [Defendants-Appellees'] stated reason for [taking the action against] her was pretextual." Luceus, 923 F.3d at 258-59 (internal quotation marks and citations omitted).

At step two, the employer bears the burden of production to set forth a legitimate, nondiscriminatory reason for the adverse action. Diaz v. City of Somerville, 59 F.4th 24, 29 (1st Cir. 2023) (citing Blare v. Husky Injection Molding Sys. Bos., Inc., 646 N.E.2d 111, 115 (Mass. 1995)). That is not an onerous task: The employer need only articulate a reason "which, on its face,

- 18 -

would justify a conclusion that" the adverse employment action was taken for a nondiscriminatory motive. Taite v. Bridgewater State Univ., Bd. of Trs., 999 F.3d 86, 93 (1st Cir. 2021) (quoting Brader v. Biogen Inc., 983 F.3d 39, 55 (1st Cir. 2020)); cf. Diaz, 59 F.4th at 29 ("[T]he second step . . . is the same under both federal and state law . . . .").

Defendants-Appellees have articulated such nondiscriminatory reasons to explain why they excluded Dr. O'Horo from the investigation process that arose from her complaints about Dr. Higgins.[5] Specifically, they proffer that (1) Dr. O'Horo, as the person who made the complaints, was not best suited to investigate them; (2) there was a separate concern that Dr. O'Horo held biases against Dr. Higgins; (3) conducting reviews was Dr. Vilvendhan's job as the Chief of the entire IR Division; and (4) Dr. O'Horo previously had failed to adequately review Dr. Higgins's cases and specifically requested Dr. Vilvendhan's assistance with reviewing some of Dr. Higgins's cases.

These reasons, on their face, are legitimate, nondiscriminatory bases for the actions that Defendants-Appellees

---

[5] The district court did not reach steps two or three of the McDonnell Douglas analysis, nor do the parties devote much time to it in their briefing on appeal. But "we may affirm the District Court on an independent ground if that ground is manifest in the record," so we will consider the parties' briefing before the district court, in which they debated steps two and three of the McDonnell Douglas framework. Brox v. Woods Hole, Martha's Vineyard & Nantucket S.S. Auth., 83 F.4th 87, 98 (1st Cir. 2023).

took.  So we turn to step three, where the burden shifts back to the plaintiff to prove pretext.

Under our Title VII jurisprudence, a plaintiff is required at step three of the McDonnell Douglas framework to make two showings by a preponderance of the evidence: first, that the reasons given by the defendant-employer "w[ere] mere pretext and[, second,] that their true motive [behind the adverse employment action] was discriminatory."  Cherkaoui, 877 F.3d at 27 (first alteration in original) (quoting Pina v. Children's Place, 740 F.3d 785, 797 (1st Cir. 2014)).  Chapter 151B does not demand as much:  Because "Massachusetts is a 'pretext only jurisdiction,'" a plaintiff proceeding under Chapter 151B need only show that "the [employer's] facially proper reasons given for its action against [the plaintiff] were not the real reasons."  Diaz, 59 F.4th at 29 (first alteration in original) (quoting Theidon, 948 F.3d at 505).  This distinction, though important in the appropriate case, does not bear on the outcome of the instant appeal.

Here, Dr. O'Horo attempts to impugn Defendants-Appellees' nondiscriminatory reasons by highlighting alleged factual contradictions and by pointing to a comparator.  We take these arguments in sequence.

We begin with Dr. O'Horo's contention that the concerns about her biases against Dr. Higgins were false.  She points first to an inconsistency between the record evidence and

- 20 -

Defendants-Appellees' interrogatory responses. That is, Defendants-Appellees' interrogatory responses identified six individuals who allegedly were unsettled about Dr. O'Horo's potential biases, but the record evidence, she maintains, shows that only two -- Drs. Soto and Moses -- questioned her ability to be impartial.

The inconsistency between the interrogatory responses and record evidence is of little import. We "focus" our pretext inquiry "on the perception of the decisionmaker," Theidon, 948 F.3d at 497 (emphasis added) (quoting Vélez v. Thermo King de P.R., Inc., 585 F.3d 441, 452 (1st Cir. 2009)), and whether there exist "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [decisionmaker's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the [decisionmaker] did not act for the asserted non-discriminatory reasons," id. (quoting Adamson v. Walgreens Co., 750 F.3d 73, 79 (1st Cir. 2014)). Here, it is undisputed that Drs. Soto and Moses were, in large part, the decisionmakers in directing the response to Dr. O'Horo's complaints about Dr. Higgins. And record evidence suggests they were concerned about Dr. O'Horo's potential biases against Dr. Higgins. It is thus inconsequential whether four other people questioned her motivations.

Dr. O'Horo then attempts to undermine the veracity of Dr. Soto's and Dr. Moses's beliefs, arguing that she informed them of the real reason why she reported Dr. Higgins more frequently: It was not racial or other bias, she claims, it was because of Dr. Higgins's higher rate of complications. This logic is unpersuasive. The determinative point is not whether the reasons to screen Dr. O'Horo from the internal investigation process "were real, but merely whether the decisionmakers -- [Drs. Soto and Moses] -- believed them to be real." Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 674 (1st Cir. 1996) (citation omitted); see also Thompson v. Coca-Cola Co., 522 F.3d 168, 177 (1st Cir. 2008) ("[T]he question is not whether [the plaintiff's] or [her] fellow employees' version is the true one, but whether [the decisionmakers] believed what [they] had been told." (fourth and fifth alterations in original)). Put another way, whether Dr. O'Horo attempted to convince Drs. Soto and Moses that she did not hold biases against Dr. Higgins is a much different question from whether Drs. Soto and Moses, in fact, believed that she was not biased. See Brandt v. Fitzpatrick, 957 F.3d 67, 80 (1st Cir. 2020) ("'[I]t is not enough for a plaintiff to show that the decisionmaker acted on an incorrect perception' or 'information that . . . later prove[d] to be inaccurate'; instead, he 'must show that the decisionmaker did not believe in the accuracy of the reason given for the adverse employment action.'" (second

alteration in original) (quoting <u>Kouvchinov</u> v. <u>Parametric Tech.</u>
<u>Corp.</u>, 537 F.3d 62, 67 (1st Cir. 2008))). And the record evidence,
indeed, suggests that how, and how frequently, Dr. O'Horo had
supervised Dr. Higgins was precisely the reason why Drs. Soto and
Moses were concerned that she held potential biases -- a far cry
from pointing out inconsistencies in Dr. Soto's and Dr. Moses's
beliefs.

Still, Dr. O'Horo protests, Defendants-Appellees' stated
reason -- <u>i.e.</u>, to protect against potential bias -- cannot be the
true motive because Dr. Vilvendhan, an allegedly less qualified
and more biased physician, took over the investigation. Dr. O'Horo
references Dr. Vilvendhan's lack of formal training in quality and
patient safety, an attending physician's written complaint to Dr.
Soto about Dr. Vilvendhan's selection to lead the internal review,
and Dr. Higgins's written complaint about Dr. Vilvendhan's
mistreatment. Dr. O'Horo then alleges that Dr. Vilvendhan was
never accused of emotional intelligence issues or holding racial
biases against Dr. Higgins, like she was. And, she continues, Dr.
Vilvendhan was never criticized for failing to ensure compliance
with the STARS reporting policy, like she was.

We understand Dr. O'Horo to be offering Dr. Vilvendhan
as a comparator. The comparison is inapt. We have long recognized
that "[a]n employer's disparate treatment of employees in response
to behavior that legitimately offends the employer can provide

evidence of discriminatory animus." Cocuzzo v. Trader Joe's E. Inc., 121 F.4th 924, 933 (1st Cir. 2024) (alteration in original) (quoting Vélez, 585 F.3d at 451); see also Yee v. Mass. State Police, 121 N.E.3d 155, 165 (Mass. 2019) (describing comparator requirements under Chapter 151B). The proffered comparator must "'closely resemble' [the plaintiff] with 'respect to relevant facts and circumstances.'" Cocuzzo, 121 F.4th at 933 (quoting Diaz, 59 F.4th at 32). "[P]erfect replicas" are not required; rather, "[r]easonableness is the touchstone." Ray v. Ropes & Gray LLP, 799 F.3d 99, 114 (1st Cir. 2015) (quoting Conward v. Cambridge Sch. Comm., 171 F.3d 12, 20 (1st Cir. 1999)). At bottom, the plaintiff "must show that the individuals with whom he [or she] seeks to be compared have 'engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir. 1996) (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir. 1992)).

Here, there exist at least two facts that materially distinguish Dr. Vilvendhan from Dr. O'Horo. For one thing, Dr. Vilvendhan is Dr. O'Horo's superior and has a broader mandate for oversight. As Chief of the IR Division, he was responsible for the overall conduct of the IR Division, including an ongoing obligation to supervise the medical procedures conducted by all

physicians with clinical privileges. What is more, Dr. Vilvendhan was not prone to the same potential risk of perceived bias that would have tainted the review had Dr. O'Horo spearheaded the investigation. That is, unlike Dr. O'Horo, Dr. Vilvendhan did not make the complaints that were being reviewed, nor was he accused by a supervisor of holding racial biases against Dr. Higgins.[6] Given that context, it is entirely consistent that Drs. Soto and Moses would have chosen to screen Dr. O'Horo from the internal investigation into Dr. Higgins. Cf. Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 743 (1st Cir. 1995) ("While the summary judgment mantra requires us to draw every reasonable inference in favor of the nonmoving party, inferences, to qualify, must flow rationally from the underlying facts; that is, a suggested inference must ascend to what common sense and human experience indicates is an acceptable level of probability.").

_____

[6] Dr. O'Horo fails to paint a clear or cohesive picture of Dr. Vilvendhan's alleged biases. In fact, Dr. Vilvendhan was accused of biases both in favor of and against Dr. Higgins. On the one hand, Dr. Higgins complained in a letter to Dr. Soto that Dr. Vilvendhan mistreated and berated him and told him that he needed "babysit[ting]." On the other hand, in Dr. O'Horo's September 11, 2019 letter to Dr. Davidoff and Scott Friedman, she said that she "ha[d] concerns that Dr. Soto and Dr. Vilvendhan are not able to be impartial in [reviewing Dr. Higgins] and may even be protecting [him]." (Emphasis added). That sentiment continued even after Dr. Vilvendhan was appointed as the internal reviewer: In Dr. O'Horo's December 7, 2019 letter to DPH, she again noted that "Dr. Vilvendhan, the individual charged with overseeing each IR provider['s] quality and safety, has a professed bias toward protecting Dr. Higgins." (Emphasis added).

Because Dr. O'Horo has raised no argument to overcome the foregoing legitimate, nondiscriminatory reasons for excluding her from the investigation process, she cannot base her disparate-treatment claim on the alleged usurpation of her duties. See Sher v. U.S. Dep't of Veterans Affs., 488 F.3d 489, 507 (1st Cir. 2007) ("[A] plaintiff generally must offer evidence to counter each [legitimate, nondiscriminatory] reason."); see also Rathbun v. Autozone, Inc., 361 F.3d 62, 79 (1st Cir. 2004) (affirming grant of summary judgment where plaintiff "call[ed] into doubt one of several rationales that [defendant] ha[d] advanced for its decision" and left other proffered rationales "unrebutted").

### (b) Scheduling Discrepancy

We turn next to Dr. O'Horo's disparate-treatment claim based on the scheduling discrepancy. We start at step one of the McDonnell Douglas framework, inquiring whether Dr. O'Horo has established a prima facie case. This part of her claim falters at the adverse employment action requirement.

"An 'adverse employment action' is one that 'affect[s] employment or alter[s] the conditions of the workplace." Morales-Vallellanes v. Potter, 605 F.3d 27, 35 (1st Cir. 2010) (alterations in original) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 61-62 (2006)). We have long held that such an action "typically involves discrete changes in the terms of employment, such as 'hiring, firing, failing to promote,

- 26 -

reassignment with significantly different responsibilities, or a decision causing significant change in benefits." Id. (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)).

Dr. O'Horo is correct that the Supreme Court's recent decision in Muldrow clarified that a plaintiff bringing a disparate-treatment claim under Title VII need not prove that a change in the terms and conditions of their employment resulted in harm that is considered "significant[, or] serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar."[7] 601 U.S. at 355 (internal quotation marks and citation omitted). While that "lowers the bar Title VII plaintiffs must meet," the plaintiff must still demonstrate that terms or conditions of her employment have changed. See id. at 356 & n.2.

Because the scheduling of reviews here at issue did not change the terms or conditions of Dr. O'Horo's employment, Muldrow does not breathe new life into her claim. Our decision in Rios v. Centerra Group LLC, 106 F.4th 101 (1st Cir. 2024), which was

---

[7] The Muldrow decision's effect on Chapter 151B disparate-treatment claims remains to be seen. No Massachusetts appellate court has discussed it yet, nor do we need to address it for purposes of this appeal. Even if we assumed that Massachusetts courts would adopt Muldrow's rationale and remove the materiality requirement from its precedent, see Yee, 121 N.E.3d at 161-62, for the reasons we discuss, Dr. O'Horo's claim still would not pass muster.

decided after Muldrow, is illustrative.[8]  There, the plaintiff claimed that he had experienced adverse employment actions when the employer "told him not to eat at his post, not to park his car in the spots near the guard rest house, . . . not to use the guard rest house bedroom to change his clothes," and "fail[ed] to provide him with any pointers at an off-duty practice session at a shooting range."  Id. at 112-13.  None of those constituted adverse employment actions, we said, because there were no "consequences" that could "represent [a] disadvantageous change in the terms or conditions of [his] employment."  Id. at 113.  Put differently, even though the plaintiff had allegedly identified an incident of "disparate treatment on account of his [protected class]," he demonstrated no "'harm' that left him 'worse off.'"  Id.

Dr. O'Horo likewise makes no effort to demonstrate with evidence how a scheduling discrepancy -- which never culminated in more frequent reviews -- caused any consequences to "the terms or conditions of [her] employment that left [her] worse off."  Id. at 112.  That is fatal to her claim based on the scheduling

---

[8] Rios is a discrimination case brought under the Americans with Disabilities Act ("ADA").  See 106 F.4th at 111. Nevertheless, we consulted Title VII case law in reaching that decision, noting that "[t]he relevant statutory language in Title VII and the ADA is virtually identical," and that, "in evaluating ADA discrimination cases, this Court previously has applied the same legal standards used to analyze discrimination under Title VII."  Id. at 112 n.4 (citations omitted).

discrepancy because she has shown <u>no</u> change in the terms or conditions of her employment on this basis.  See <u>id.</u> at 113.

## (c) Hostile Work Environment

We next turn to Dr. O'Horo's hostile work environment claim, noting at the outset that Defendants-Appellees have not disputed the timeliness of that claim.  Nor could they.  "[B]ecause 'hostile work environment claims do not turn on single acts but on an aggregation of hostile acts extending over a period of time,'" we have held, "the applicable statute of limitations 'will not exclude acts that are part of the same unlawful employment practice if at least one act falls within the time period.'"  <u>Cordero-Suárez</u> v. <u>Rodríguez</u>, 689 F.3d 77, 82 (1st Cir. 2012) (first quoting <u>Marrero</u> v. <u>Goya of P.R., Inc.</u>, 304 F.3d 7, 18 (1st Cir. 2002); and then quoting <u>Dressler</u> v. <u>Daniel</u>, 315 F.3d 75, 79 (1st Cir. 2003)).

On the merits, however, is where Dr. O'Horo's claim stalls.  To prevail on a gender-based hostile work environment claim, a plaintiff must establish the following six elements: "(1) unwelcome harassment that was (2) severe or pervasive, and (3) both objectively and subjectively offensive," and (4) that she was a "member[] in a protected class, (5) that the harassment was motivated by sex, and (6) [that there is] a basis for employer liability."[9]  <u>Maldonado-Cátala</u> v. <u>Mun. of Naranjito</u>, 876 F.3d 1,

---

[9] Dr. O'Horo does not contend that there is any difference in how we evaluate a hostile work environment claim under Title VII

10 n.11 (1st Cir. 2017).  In essence, Dr. O'Horo must show that the "workplace was 'permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of . . . [her] employment and create an abusive working environment.'"  Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 91 (1st Cir. 2018) (alteration in original) (quoting Quiles-Quiles v. Henderson, 439 F.3d 1, 7 (1st Cir. 2006)).

Dr. O'Horo bases much of her claim on the following allegations:

> (1) that Dr. Higgins "mansplain[ed]" and spoke condescendingly to her in August 2018 and throughout 2019;
>
> (2) that Dr. Moses called her a "square peg in a round hole";
>
> (3) that Dr. Moses discussed with Dr. Davidoff the "interactive and emotional intelligence issues" Dr. O'Horo was having with respect to her handling of Dr. Higgins;
>
> (4) that Dr. Moses suggested Dr. O'Horo might be targeting Dr. Higgins, who is Black, because of his race;
>
> (5) that Dr. Vilvendhan indicated in the fall of 2018 that Dr. Soto might take more seriously Dr. O'Horo's complaints because she is a woman; and

---

and Chapter 151B.  So we analyze both claims under the federal antidiscrimination cases.  See Ponte v. Steelcase Inc., 741 F.3d 310, 319 n.9 (1st Cir. 2014).

(6) that Drs. Soto, Moses, and Davidoff excluded Dr. O'Horo from the investigation into Dr. Higgins and thereby undermined her safety concerns.[10]

Even if we assume as true Dr. O'Horo's version of the foregoing allegations, when viewed both individually and collectively, they do not amount to the sort of severe and pervasive harassment based on gender necessary to establish a hostile work environment claim.

As an initial matter, Dr. O'Horo's claim rests, in large part, on incidents with no apparent relation to her gender, and she makes no effort -- beyond pointing to her subjective beliefs -- to demonstrate such gender-based discriminatory animus. See Stratton, 113 F.4th at 51 (affirming summary judgment when plaintiff "offer[ed] no evidence that her supervisors' reported comments were based on or even related to her disability," and "simply assume[d] that the[] 'snide comments' establish a

---

[10] Dr. O'Horo also directs us to a comment made by Dr. David McAneny, the Vice Chair of the Department of Surgery. According to Dr. O'Horo, Dr. McAneny stated that he would fix the issues Dr. O'Horo had identified and subsequently asked if she could buy him a six pack of beer. We will not consider this as evidence of the hostile work environment claim because Dr. O'Horo admitted at her deposition -- well after the initiation of this lawsuit -- that she was not subjectively offended. As she put it, "That was -- that was great. That was really just very empathetic on his part. I appreciated that." Accordingly, Dr. McAneny's statement cannot form the basis of her claim. See Pérez-Cordero v. Wal-Mart P.R., Inc., 656 F.3d 19, 27 (1st Cir. 2011) (explaining that the "objectionable conduct" must be "both objectively and subjectively offensive"); Dahms v. Cognex Corp., 914 N.E.2d 872, 885 (Mass. 2009) (noting "the settled rule that a hostile workplace claim fails if the plaintiff was not subjectively offended by the particular conduct that formed that basis of the claim").

discriminatory environment without providing the 'surrounding details to place the remarks in context'" (quoting Murray v. Warren Pumps, LLC, 821 F.3d 77, 87 (1st Cir. 2016)); see also Rivera-Rivera, 898 F.3d at 94 (1st Cir. 2018) (declining to consider certain harassing conduct as evidence of gender discrimination when plaintiff did not "do[] enough dot connecting for us to conclude that the harassment she alleges has as its basis her membership in a protected class").[11]

Take first Dr. O'Horo's contention that she felt Dr. Higgins "mansplained" to her on one occasion and, throughout 2018 and 2019, treated her worse than her male colleagues. But harassment coupled with a plaintiff's subjective belief of discrimination "doesn't tell us much," because "there is a plethora of reasons" why Dr. Higgins could have treated Dr. O'Horo poorly "that have no nexus to her gender." Rivera-Rivera, 898 F.3d at 94. Indeed, the record evidence shows that Dr. Higgins had interpersonal conflicts with many colleagues, including several non-female ones. It is undisputed that a nursing manager brought to Dr. Soto's attention concerns about Dr. Higgins's treatment of male staff members; that a male resident complained of being

---

[11] Stratton's hostile work environment claim was brought under the ADA. 113 F.4th at 50-51. Notwithstanding, we relied on Title VII case law in reaching that decision. See id. at 51 n.24 ("Congress wrote the ADA using the language of Title VII, and Title VII recognizes hostile work environment claims." (quoting Ford v. Marion Cnty. Sheriff's Off., 942 F.3d 839, 852 (7th Cir. 2019))).

"clearly scared to talk to [Dr. Higgins] about anything"; that Dr. Higgins "publicly berated" a male trainee in front of his colleagues; that another male trainee felt "unsafe" and feared retaliation if he were to report Dr. Higgins's misconduct; and that Dr. Leo Campos, a male interventional radiologist, also complained to BMC leadership of conflicts with Dr. Higgins. In other words, the record evidence suggests that Dr. Higgins's interpersonal conflicts were not unique to Dr. O'Horo, specifically, or women, generally; rather, Dr. Higgins treated many of his colleagues, including non-female ones, the same: poorly. And "generally disagreeable behavior" without discriminatory animus is beyond Title VII's purview. Ahern, 629 F.3d at 59; see also Rodríguez-Severino v. UTC Aerospace Sys., 52 F.4th 448, 464-65 (1st Cir. 2022) ("The Supreme Court has cautioned that Title VII does not set forth a general civility code for the American workplace." (internal quotation marks and citations omitted)).

Besides her subjective beliefs, which are patently insufficient at this stage, see Henderson v. Mass. Bay Transp. Auth., 977 F.3d 20, 29 (1st Cir. 2020), Dr. O'Horo presents no evidence to connect Dr. Higgins's conduct to gender-based discriminatory animus. So we will not consider the tense, but nondiscriminatory, relationship between Dr. O'Horo and Dr. Higgins in analyzing her hostile work environment claim.

Same goes for three of the four statements proffered by Dr. O'Horo, namely, that Dr. Moses called her a "square peg in a round hole," that Dr. Moses discussed with Dr. Davidoff the "interactive and emotional intelligence issues" Dr. O'Horo was having with respect to Dr. Higgins, and that Dr. Moses suggested that Dr. O'Horo held racial biases against Dr. Higgins. Viewed through an objective lens, these statements have no readily apparent relation to Dr. O'Horo's gender. And, again, the record evidence indicates that Dr. O'Horo's supervisors might have made these statements to her (and not to male employees) for several reasons unrelated to her gender. Rivera-Rivera, 898 F.3d at 94. All we have to tie these comments to Dr. O'Horo's gender, though, is Dr. O'Horo's conjecture. At the summary judgment stage, a plaintiff offering facially neutral statements as evidence of discriminatory motive must guide the court in demonstrating how the statements evince discriminatory animus. Dr. O'Horo's subjective perception, standing alone, is not enough. See Henderson, 977 F.3d at 29.

Next, we have Dr. O'Horo's suggestion that Drs. Soto, Moses, and Davidoff repeatedly undermined her safety concerns by (1) screening her from the investigation into Dr. Higgins and (2) scheduling her for reviews. As we already have explained, however, Dr. O'Horo has not shown that the decision to screen her from the investigations precipitated by her own complaints was

pretextual. Nor does Dr. O'Horo connect any evidentiary dots sufficient to demonstrate that the screening decision was made because of Dr. O'Horo's gender. Rivera-Rivera, 898 F.3d at 94. Although Dr. O'Horo pointed to the review calendar as circumstantial evidence that she was scheduled to be reviewed more than her male colleagues, she was reviewed only one time, and she made no effort to show that it caused her any objective harm. See Maldonado-Cátala, 876 F.3d at 10 ("The challenged conduct must be 'both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive . . . .'" (quoting Pérez-Cordero, 656 F.3d at 27)).

Still, even if we consider the scheduling discrepancy alongside the remaining evidence -- i.e., Dr. Vilvendhan's comment in the fall of 2018 that Dr. O'Horo's complaints might be taken more seriously because she is a woman -- we fail to see a workplace situation so severe or so pervasive with discriminatory animus that it amounts to a hostile work environment. Our decision in Colón-Fontánez v. Mun. of San Juan, 660 F.3d 17 (1st Cir. 2011) is instructive. There, the plaintiff brought, among other claims, a retaliatory hostile work environment claim under the ADA. Id. at 22. In support of that claim, she demonstrated that her supervisor "refuse[d] to meet with her" but "permitted other employees to come and go from her office"; "avoided Colón, required Colón to wait, restricted Colón's access to her, and refused to amicably

greet her in general encounters"; "threw Colón and a co-worker out of her office, yelling at them in front of other . . . employees"; "failed to take action against various employees who made comments against Colón"; designated Colón's co-workers to monitor her "if she left her desk to go to the bathroom"; and excluded Colón from a workshop. Id. at 44. Colón also highlighted several insensitive comments relating to her protected status. Id. at 45. Those facts, we held, "indicate[d] an uncomfortable and tense working" environment, but "they [we]re not sufficiently severe or pervasive to constitute a hostile work environment." Id. at 44.

So too here. The severity of the misconduct about which Dr. O'Horo complains -- the unequal review schedule and one actual review in January 2020 and a stray remark from Dr. Vilvendhan in the fall of 2018 -- pales in comparison to that demonstrated by Colón. Consequently, we cannot find that Dr. O'Horo's evidence of gender-based conduct is sufficiently severe to withstand summary judgment. Id. And even though "[w]e have upheld hostile work environment claims where harassment has been more pervasive than severe," Flood v. Bank of Am. Corp., 780 F.3d 1, 11 (1st Cir. 2015), the two incidents over a year apart come nowhere close to establishing harassment that was "more or less constant," Marrero, 304 F.3d at 19; cf. Alvarado v. Donahoe, 687 F.3d 453, 462 (1st Cir. 2012) (collecting cases and holding that "three discrete verbal exchanges taking place over the course of a period spanning

more than eight months . . . does not rise to the level of pervasiveness . . . which we have, in the past, considered indicative of a hostile or abusive work environment").

Therefore, we affirm the district court's ruling that Dr. O'Horo has not established a hostile work environment claim.

### (d) Constructive Discharge or Demotion

Lastly, Dr. O'Horo fashions a claim based on the theory of constructive discharge. To the extent she grounds her claim in the facts underlying her hostile work environment claim, our analysis need go no further. Because "[c]reation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case," Dr. O'Horo's failure to establish a hostile work environment necessarily forecloses her hostile-environment constructive discharge claim. Pa. State Police v. Suders, 542 U.S. 129, 149 (2004); see also Green v. Brennan, 578 U.S. 547, 559 (2016) (reiterating the rule "that a hostile-work-environment claim is a 'lesser included component' of the 'graver claim of hostile-environment constructive discharge'" (quoting Suders, 542 U.S. at 149)).

Dr. O'Horo, however, presses another theory of constructive discharge: She says she was constructively demoted from her role as Director of Quality and Safety, which, in turn, compelled her to resign. And, in support of her argument, Dr. O'Horo cites our decision in Agosto-de-Feliciano v. Aponte-Roque,

889 F.2d 1209 (1st Cir. 1989) (en banc), a First Amendment freedom-of-association -- not Title VII -- case.

Dr. O'Horo's reliance on that decision is misplaced. In the Title VII context, we already have recognized that an employee's "reduction from [important] duties . . . to performing clerical work" could be an actionable adverse employment action. Burns v. Johnson, 829 F.3d 1, 10 (1st Cir. 2016). But Dr. O'Horo's reduction-of-duties theory holds no water because, we already have held, she did not show pretext.

**2. Chapter 151B Aiding and Abetting**

Dr. O'Horo also brings a claim against Dr. Soto under Mass. Gen. Laws ch. 151B, § 4(5), which renders it unlawful for "any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or to attempt to do so." It is, simply stated, an aiding and abetting claim that is "entirely derivative of the discrimination claim" under Chapter 151B. Abramian v. Pres. & Fellows of Harvard Coll., 731 N.E.2d 1075, 1088 (Mass. 2000). This means that where the underlying discrimination claim is dismissed, the aiding and abetting claim cannot stand.

Here, because we have upheld the grant of summary judgment as to Dr. O'Horo's gender-discrimination claims, we also

- 38 -

affirm the district court's holding as to the derivative aiding and abetting claim against Dr. Soto.

## C. Whistleblower Claim[12]

Dr. O'Horo also appeals the entry of summary judgment on her MHCWA claim. The MHCWA prohibits a "health care facility" from "tak[ing] any retaliatory action" -- defined as "the discharge, suspension, demotion, harassment, denial of a promotion or layoff or other adverse action taken against a health care provider affecting the terms and conditions of employment" -- because a health care provider has engaged in certain forms of protected conduct. Mass. Gen. Laws ch. 149, § 187(a), (b). Dr. O'Horo alleged that she had engaged in protected conduct when she raised her concerns about Dr. Higgins, first with Dr. Moses in January 2019 and then in her whistleblower letters later that year. She contended that BMC had then taken "retaliatory action" against her by (1) selecting another doctor for a speaking engagement at a conference in Argentina; (2) assigning two administrative roles, which the parties call "directorships," to other doctors; and (3) constructively discharging her by taking the actions that we have previously detailed.

---

[12] We refer in this section primarily to BMC, because it is the only party against whom Dr. O'Horo brought her MHCWA claim.

In its motion for summary judgment, BMC argued that the alleged retaliatory actions did not qualify as such under the MHCWA and that Dr. O'Horo had not presented evidence of a causal link between her protected conduct and those actions sufficient to create a trialworthy issue. Applying the burden-shifting framework outlined in McDonnell Douglas, the district court held that Dr. O'Horo had failed to make a prima facie showing that she had been constructively discharged or that her protected conduct had caused BMC to pass her over for the speaking engagement in Argentina. The court also concluded that Dr. O'Horo had not made a prima facie showing that her non-selections for the directorships qualified as "retaliatory action[s]," reasoning that because there was no evidence the two positions would afford her any benefits that she did not already receive in connection with her own directorship, her non-selections did not alter the "terms or conditions" of her employment. Mass. Gen. Laws ch. 149, § 187(a). In the alternative, the court determined that BMC had articulated a legitimate, nondiscriminatory reason for her non-selections that Dr. O'Horo had failed to show was pretextual: namely, that her directorship came with better financial support than the others, such that those positions would have essentially amounted to demotions.

On appeal, Dr. O'Horo disputes nearly all of the district court's conclusions. Before reaching her arguments, however, we

are faced with a threshold question: should we evaluate the evidence pertaining to Dr. O'Horo's MHCWA claim under the McDonnell Douglas burden-shifting framework? We are aware of no decision rendered by a Massachusetts appellate court addressing whether McDonnell Douglas applies to claims brought under the MHCWA.[13] The absence of authority likely would be irrelevant if the McDonnell Douglas framework were a rule of procedure which merely "regulate[d] just the order of proof and the allocation of burdens of production and ha[d] no substantive implications," Bourbon v. Kmart Corp., 223 F.3d 469, 476 (7th Cir. 2000) (Posner, J., concurring), since federal courts supply their own procedural rules when adjudicating state-law claims, see Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co., 559 U.S. 393, 398-99, 406-07 (2010); see also id. at 418-19, 422 (Stevens, J., concurring in part and concurring in the judgment). But we have not decided whether the McDonnell Douglas framework provides a procedural rule or is instead substantive federal law. See Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 345-46 (1st Cir. 2018). And, if we were to determine that it were substantive law, then we (and the district court) could not apply it to an

---

[13] The sole decision issued by a Massachusetts appellate court reviewing the entry of summary judgment on an MHCWA claim on the merits was decided against the plaintiff without reference to McDonnell Douglas. See Romero v. UHS of Westwood Pembroke, Inc., 893 N.E.2d 355, 358-60 (Mass. App. Ct. 2008).

MHCWA claim unless we were to conclude that the SJC would do the same; that is, unless we were to determine that, notwithstanding its federal origins, the SJC would adopt the McDonnell Douglas framework as Massachusetts substantive law applicable to the MHCWA. Cf. Turner v. Marathon Petroleum Co., 804 F. App'x 375, 377 (6th Cir. 2020) ("Kentucky courts have themselves long used the McDonnell Douglas approach to resolve claims under the Kentucky Civil Rights Act. So even if the federal burden-shifting approach were substantive, it would still apply here as a matter of state law." (citations omitted)).

We may bypass these issues, however, because, as we explain below, Dr. O'Horo has not adduced sufficient evidence to proceed to trial even with the benefit of McDonnell Douglas's burden-shifting framework. Cf. Theriault, 890 F.3d at 351 (declining to decide whether McDonnell Douglas's framework was substantive or procedural because the plaintiff was required to "adduce precisely the same quantum of proof [under the Maine statute there at issue] that she would have had to adduce to defeat summary judgment under the McDonnell Douglas framework"). We therefore address Dr. O'Horo's claims under the McDonnell Douglas framework, without deciding its applicability.

With respect to the selection of another doctor for the speaking engagement in Argentina, the district court correctly concluded that Dr. O'Horo's protected conduct postdated the

selection and therefore could not have been the reason she was passed over. See Muñoz v. Sociedad Española de Auxilio Mutuo y Beneficiencia de P.R., 671 F.3d 49, 56 (1st Cir. 2012) ("Absent special circumstances . . . an adverse employment decision that predates a protected activity cannot be caused by that activity."). Dr. O'Horo disputes this chronology, arguing that the court erred by crediting Dr. Soto's "bald . . . [and] self-serving" claim, made in an affidavit submitted in support of Defendants-Appellees' motion for summary judgment, that the other doctor had been invited in 2018, before Dr. O'Horo raised her concerns about Dr. Higgins with Dr. Moses in January 2019. But the affidavit was properly considered, see Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 53 (1st Cir. 2000), and was corroborated by an email chain showing that the invitation in fact had been extended in December 2018.

There was likewise no error in the district court's conclusion that Dr. O'Horo could not show a causal link between her protected conduct and her non-selections for the two directorships. Dr. O'Horo characterizes the non-selections as denials of "lateral promotions," which, she contends, can constitute retaliatory action under the MHCWA. And she asserts that weaknesses in BMC's explanation for her non-selections -- that the positions offered less favorable benefits and compensation than the one she already held -- permit

- 43 -

a reasonable jury to infer pretext. We disagree. Even assuming that Dr. O'Horo's non-selections amounted to denials of "lateral promotions" and that such denials are cognizable as "retaliatory actions" under the MHCWA, the district court correctly concluded that Dr. O'Horo had not provided sufficient evidence of pretext to permit her claim to proceed to trial.

Start with temporal proximity. Dr. Higgins was selected for one of the directorships approximately a week after Dr. O'Horo sent her first whistleblower letter, and at some subsequent point, the other position was offered to another doctor. This is close in time, to be sure, but we have found even "very close" temporal proximity, perhaps adequate to make a prima facie showing of causation, Ahern, 629 F.3d at 58 (quoting Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001)), still insufficient, without more, to establish pretext, see, e.g., Echevarría v. AstraZeneca Pharm. LP, 856 F.3d 119, 138 (1st Cir. 2017) (one day between protected conduct and alleged retaliatory action insufficient to establish pretext); Alvarado, 687 F.3d 463-64 (same, but one week); Carreras v. Sajo, García & Partners, 596 F.3d 25, 38 (1st Cir. 2010) (same, but four days). Dr. O'Horo offers no reason why we should reach a different conclusion here.

If Dr. O'Horo could pair the temporal proximity between her protected conduct and the two non-selections with other evidence undermining BMC's stated reason for not having chosen

- 44 -

her, her non-selection claim might withstand summary judgment. See, e.g., Fournier v. Massachusetts, No. 20-2134, 2021 WL 4191942, at *4 (1st Cir. Sept. 15, 2021) (reversing grant of summary judgment where close temporal proximity was combined with other evidence); Harrington v. Aggregate Indus.-Ne. Region, Inc., 668 F.3d 25, 33-35 (1st Cir. 2012) (same). But instead, "[t]he larger picture undercuts any claim of causation." Pena v. Honeywell Int'l, Inc., 923 F.3d 18, 33 (1st Cir. 2019) (alteration in original) (quoting Soileau v. Guilford of Me., Inc., 105 F.3d 12, 16 (1st Cir. 1997)). Dr. O'Horo does not point to evidence showing that, contrary to BMC's explanation, the other directorships would have been more advantageous in their allotted academic time and funding, or to changes or inconsistencies in BMC's explanation for her non-selections which might permit a finding of pretext. See Rodríguez-Cardi v. MMM Holdings, Inc., 936 F.3d 40, 49 (1st Cir. 2019). Nor has she offered other evidence that might permit a jury to infer a retaliatory motive for her non-selection.[14] For instance, nothing in the record indicates that BMC officials thought that Dr. O'Horo would have preferred the other

---

[14] Dr. O'Horo argues that several other facts -- namely, BMC's failure to post the directorship positions and the lack of objective criteria and written guidelines for filling them -- evidence retaliation. But Dr. O'Horo provides no evidence to suggest that this was not BMC's standard process for filling directorship positions. Such a change in processes would be necessary to suggest that BMC was motivated by retaliation for protected conduct.

directorships to her own or believed that those positions were superior.

Dr. O'Horo alternatively argues that she could have simultaneously held multiple directorships which, she submits, belies the explanation offered by BMC for her non-selections by rendering the relative desirability of the three positions irrelevant. She principally relies on the fact that Dr. Higgins at one point held two directorships. But, as BMC notes (and Dr. O'Horo provides no evidence to rebut), when Dr. Higgins assumed a second directorship, he was the only interventional radiologist remaining in the department.[15] Dr. O'Horo has provided no evidence suggesting that, when there were multiple interventional radiologists in the department, physicians would or could hold more than one directorship.[16] Rather, as BMC explained, directorships were assigned to physicians who did not already have leadership roles in the department. And here, again, Dr. O'Horo has pointed to nothing in the record to the contrary.

---

[15] Dr. O'Horo also relies on the fact that Dr. Vilvendhan's replacement as division chief simultaneously held that position and her former role as director of quality and safety. But the record reflects that this also occurred when BMC was short-staffed.

[16] Indeed, as BMC noted below, when Dr. Higgins accepted one of the directorships for which Dr. O'Horo claims she was retaliatorily not selected, he gave up a different directorship in order to do so.

- 46 -

We also agree with the district court, for the reasons we have previously explained, that Dr. O'Horo was not constructively discharged.[17]  On appeal, Dr. O'Horo shifts her focus, arguing that the actions that together comprised her alleged constructive discharge are each individually sufficient to constitute "retaliatory action" under the MHCWA.  Dr. O'Horo did not press this theory below, and even assuming that she can alter her claims in this manner on appeal, but see United States v. Leach, 89 F.4th 189, 200-01 (1st Cir. 2023) ("A party cannot preserve a claim of error by switching horses in midstream, that is, by making one claim below and a different claim on appeal."), they still cannot survive summary judgment.

None of the components of Dr. O'Horo's constructive discharge claim are sufficient, standing alone, to sustain a MHCWA

_____

[17] The district court's ruling relied, in part, on certain of Dr. O'Horo's communications with colleagues in which she characterized her departure from BMC as a resignation and expressed that she strategically timed her exit to strengthen her legal case. The district court read these communications as revealing Dr. O'Horo's subjective beliefs that she had resigned, rather than had been constructively discharged.  Given the other evidence in the record showing Dr. O'Horo's ill feelings about the working environment and subjective offense to certain actions, however, these texts raised a credibility issue on the subject of whether she was subjectively offended best reserved for the factfinder. Cf. Gerald v. Univ. of P.R., 707 F.3d 7, 17-19 (1st Cir. 2013) (holding that there was adequate evidence of subjective offense to withstand summary judgment even where plaintiff had sent the harassing defendant "joking emails . . . after each of the three [incidents]" and expressed to colleagues that "she could work with [the harassing defendant] and wanted to repair things with him").

claim. The fact that BMC chose someone else to lead the investigation of Dr. Higgins and did not let Dr. O'Horo play her desired role in the external review of the IR Division does not, as we have explained, show gendered animus; for substantially the same reasons, it does not show retaliatory animus either. Dr. O'Horo's allegation that she was excluded from a meeting is undermined by emails reflecting that she was invited to the meeting but declined to attend it. And the fact that Dr. O'Horo was scheduled to be reviewed somewhat more frequently than other doctors does not constitute a "retaliatory action" under the MHCWA. Dr. O'Horo argues otherwise, pointing to the MHCWA's prohibition on retaliatory "harassment," which she contends encompasses the scheduling discrepancy to which she was subjected. But we do not interpret statutory language in a vacuum, and Dr. O'Horo's reading ignores important context. See Util. Air Regul. Grp. v. EPA, 573 U.S. 302, 320 (2014). Each of the MHCWA's other enumerated "retaliatory action[s]" -- "discharge, suspension, demotion, . . . denial of a promotion[, and] layoff," Mass. Gen. Laws ch. 149, § 187(a) -- amount to something analogous to an "adverse employment action," as the term is used under other civil rights statutes, see Stratton, 113 F.4th at 38, 41 n.10, and the MHCWA's catch-all clause, which encompasses "other adverse action[s] . . . affecting the terms and conditions of employment," further suggests an interpretation of the term "harassment" that

likewise covers only conduct sufficient to affect the terms or conditions of the plaintiff's employment, Mass. Gen. Laws ch. 149, § 187(a).  The scheduling discrepancy, which resulted in only one review, does not meet that standard because, as we have explained, she did not show any harm to a term or condition of employment. Cf. Rios, 106 F.4th at 112 (holding plaintiff "must at least offer evidence of a change in the terms or conditions of his employment that left him worse off").

## III.

For the foregoing reasons, the judgment of the district court is **affirmed**.